Ex parte Jack Emory FARLEY, Public
Advocate, Office for Public Advocacy,
Commonwealth of Kentucky, Larry Otis
Bendingfield, and Robert E. Martin, III.

Supreme Court of Kentucky.

July 25, 1978.

Jack Emory Farley, Public Advocate, Kevin Michael McNally, Erwin W. Lewis, Asst. Public Defenders, Frankfort, for petitioners.

Robert F. Stephens, Atty. Gen. by Carl T. Miller, Jr., Asst. Atty. Gen., Frankfort.

PALMORE, Chief Justice.

This proceeding began in the form of a "Complaint for Declaration of Rights" filed by the petitioners in the Franklin Circuit Court. Named as defendants were the Su-

preme Court of Kentucky "both individually and collectively," the Chief Justice and individual Justices of the Supreme Court in their respective official capacities, the Administrative Office of the Courts and its Director, and the Executive Assistant to the Chief Justice. For reasons presently discussed we ordered the proceeding transferred to this court and directed that it be styled, treated and practiced as an *ex parte* application for the ultimate relief desired by the petitioners, which is that they be provided "periodic inspections" and the right to copy whatever records are being compiled pursuant to KRS 532.075(6).

KRS 532.075 was enacted at the 1976 Extraordinary Session of the General Assembly as part of a series of statutory sections relating to the death penalty for serious criminal offenses. Ch. 15, Acts of 1976 (Ex. Session). These statutory sections were patterned after similar provisions enacted by the State of Georgia had passed constitutional muster in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

With exceptions not here pertinent, the laws of this state always have required that the quantum of punishment in a criminal case be prescribed, within the applicable statutory limits, by the jury. See, for example, Chapter IV, § 15, Acts of 1798, as contained in 2 Littell's Statute Laws of Kentucky, p. 14; § 1136, Carroll's Kentucky Statutes (Baldwin, 1922); Criminal Code § 258, Carroll's Kentucky Codes (Baldwin, 1938); KRS 431.130 (Baldwin, 1955). By Chapter 234, Acts of 1962, the Rules of Criminal Procedure (RCr) were recognized as superseding the old Criminal Code and, among other things, KRS 431.130 was amended to delete reference to the fixing of punishment. Since that time the jury requirement has been preserved in RCr 9.84.

From a reading of the 1976 Act (KRS 532.025–532.100, incl.) it may be seen that from the beginning of the trial in a capital case there are four successive inquiries leading to final confirmation of the death sentence. First is a trial on the question of guilt or innocence. Then if the defendant is found guilty the court is required to resume the trial and conduct a presentence hearing, at which the same jury hears evidence of aggravating and mitigating circumstances as defined in KRS 532.025(2), determines whether any of those circumstances exist, and recommends a sentence. Thirdly, whatever may be the jury's recommendation, "upon the findings of the jury, the judge shall fix a sentence within the limits prescribed by law."[1] Lastly, if the death sentence is imposed, KRS 532.075 requires that it be reviewed by the Supreme Court "on the record." This much must be done regardless of whether there is an appeal. Cf. KRS 532.075(2), (8).

In addition to those matters that are discernible "on the record," KRS 532.075(3) introduces a question calling for another category of information (which, of course, would not appear in the record of the case) to be considered by the Supreme Court incident to its review of the sentence: "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

To implement this latter provision, KRS 532.075(6) provides as follows:

"(6) The chief justice shall assign to an administrative assistant who is an attorney the following duties:

(a) To accumulate the records of all felony offenses in which the death penalty was imposed after January 1, 1970, or such earlier date as the court may deem appropriate.

(b) To provide the court with whatever extracted information it desires with respect thereto, including but not limited to a synopsis or brief of the facts in the record concerning the crime and the defendant.

---

1. Whether the trial judge may fix a penalty not recommended by the jury is a question that has not been litigated in this court. In Georgia the trial judge is bound by the jury's recommended sentence, though a sentence of death cannot be imposed unless at least one of the aggravating factors has been found to exist. §§ 26–3102, 27–2514, Ga.Code Ann. (1977).

(c) To compile such data as are deemed by the chief justice to be appropriate and relevant to the statutory questions concerning the validity of the sentence."

KRS 532.075(5) provides in part as follows (referring to the Supreme Court): "The court shall include in its decision a reference to those similar cases which it took into consideration."

The petitioner Farley is Public Advocate (formerly Public Defender, cf. Ch. 155, § 20, Acts of 1978) for the Commonwealth. His office is an "independent agency of state government," KRS 31.010, and its duties include the defense of indigent defendants in criminal cases. KRS 31.030. Despite this legislative designation of his office as an independent agency of state government, the Public Advocate is "directly responsible" to the Secretary of Justice. KRS 31.020. The Secretary of Justice is head of the Department of Justice, and is an executive cabinet officer appointed by the Governor. KRS 11.065, 12.020. The Office for Public Advocacy is, in fine, an agency of the executive branch of the state government, and insofar as his relationship to the Court of Justice (cf. Const. § 109) is concerned, the position of the Public Advocate is no more and no less than that of any other lawyer practicing before it.

The Court of Justice and its officers and employes are the judicial department of the Commonwealth. Const. §§ 27, 28, 109. The Court of Justice is a "unified judicial system for operation and administration." Id., § 109. In addition to its appellate jurisdiction with regard to matters in litigation, Const. § 110 expressly recognizes the authority of the Supreme Court "to exercise control of the Court of Justice." The existence of such authority at some point in the structure is, of course, indispensable to a "unified judicial system for operation and administration." Though Const. § 110(5)(b) provides that the Chief Justice "shall be the executive head of the Court of Justice," there can be little doubt that § 110 vests the supervisory and policy-making authority of the judicial department in the Supreme Court. Cf. SCR 1.020(1)(a).

Const. § 110(5) directs the Chief Justice to appoint such administrative assistants as he deems necessary. KRS 27A.015 provides for an administrative office of the courts (hereinafter AOC) and a director of that office to serve as the staff of the Chief Justice in executing the policies and programs of the Court of Justice. Clearly, this office and its director and employes are part and parcel of the judicial department of the state. They are, in fact, inseparable from the office of the Chief Justice itself.

We have recited these humdrum details in order that things may be kept in proper focus as we go along.

As of this writing, no case has been brought to this court for review of a death sentence under KRS 532.075, though at least one appears to be in the offing and the petitioners Bendingfield and Martin evidently regard themselves as likely candidates. Meanwhile, the task of accumulating the information mentioned in KRS 532.-075(6) has been undertaken by personnel of AOC under the supervision of its Director and of the Chief Justice, but the court has not yet considered or determined which, if any, of the informational materials so collected (beyond the death-penalty cases since January 1, 1970) might be appropriate and relevant to the statutory questions concerning the validity of any particular death sentence or any prospective sentences of that nature.

In July of 1977 Farley's office wrote a letter to AOC expressing the desire "to have input into what types of data will be collected and . . . have access to that data." In August of 1977 another such letter was addressed to the then Chief Justice reporting that the petitioner Bendingfield had been convicted of two capital offenses and requesting all information compiled pursuant to KRS 532.075(6) so that the trial judge might be advised of the "factors . . . relevant to his decision regarding whether to accept the jury's recommendation of death for our client" and "relevant to our challenge to the constitutionality of the statute." In a reply prepared at the direction of the Chief Justice,

AOC advised that the work had just begun, that no information was available thus far, and that whether it would become available at some time in the future was a question to be taken up with the Chief Justice. In November of 1977 the Public Advocate wrote the present Chief Justice to the effect that although the statute did not so require, it would avoid wasteful duplication of effort if the material being accumulated by AOC were made available to his office. A reply from the Chief Justice advised the Public Advocate that the matter had been discussed with the members of the court and the court was not convinced it was desirable.

On March 21, 1978, by letter, Farley requested the opportunity of inspecting "the public records" compiled by AOC pursuant to KRS 532.075 and cited KRS 61.870, et seq., the "Open Records Law," as authority for him to do so. A reply prepared by AOC advised that the court considered the information as being for its own use and that it would not be made available until the Chief Justice determined otherwise. Meanwhile, at least two efforts were made, unsuccessfully, by members of the Public Advocate's staff to bring the desired materials into court through subpoenas served upon the Administrative Director of the Courts in criminal trial proceedings, and on April 20, 1978, the Attorney-General, replying to an appeal made by the Public Advocate under KRS 61.880 (a provision of the Open Records Law), issued an opinion advising that the records of the Supreme Court do not come within the purview of the Open Records Law. Being aggrieved by that opinion, the Public Advocate instigated the proceeding that is the subject of this opinion.

In considering the arguments presented it is necessary to distinguish between those claims by the Public Advocate and his office in their official capacity and those claims purportedly being made in behalf of Bendingfield and Martin. Whatever may be his duties toward a client, there is no legal principle under which an attorney has a cause of action in his own name and right for a wrong or fancied wrong to the client. Neither in the role of counsel for Bending-

field and Martin nor in his statutory capacity does the Public Advocate have any of the constitutional rights that he claims are being trampled asunder by this court. In so saying, we do not overlook the contention that he is being denied access to the courts, but we regard that argument as nothing short of frivolous. He is, after all, in court now, even though he prefers to be in some other court. The rights he claims, if they exist, are purely statutory.

We shall deal first with the rash of hyperbolic arguments pertaining to jurisdiction and propriety.

Const. § 110(2)(a) confers upon the Supreme Court "the power to issue all writs . . . as may be necessary to exercise control of the Court of Justice." Prior to its amendment in 1975 (effective January 1, 1976) Const. § 110 provided that the Court of Appeals (now the Supreme Court) "shall have power to issue such writs as may be necessary to give it a general control of inferior jurisdictions." It was under this section that the Court of Appeals had authority to issue the familiar writs of mandamus and prohibition. *Board of Prison Com'rs v. Crumbaugh,* 161 Ky. 540, 170 S.W. 1187, 1188 (1914); *Childers v. Stephenson,* Ky., 320 S.W.2d 797, 799 (1959). But its authority was never restricted to that which was familiar. Quite apart from the express authority conferred with respect to inferior courts, "The right of self-preservation is inherent in the court, and is not derived from, or dependent upon, any act of the Legislature, or any express provision of the Constitution. It inheres in the court as such, and is necessary to vindicate its authority and to maintain its integrity." *Capps v. Gore,* 231 Ky. 185, 21 S.W.2d 266, 267 (1929). "It is the prime duty of this Court to assure to the best of its ability the orderly and effective administration of justice in this jurisdiction, and it has the inherent power to do what is reasonably necessary to attain that goal. . . . And, indeed, a court 'may, in appropriate cases, make ex parte orders without formally instituting an action to secure the desired relief.'" *In re Appointment of Clerk of*

*Court of Appeals,* Ky., 297 S.W.2d 764, 765 (1957).

Nothing in the 1975 amendment to Const. § 110 suggests any intention to whittle down either the express or the implied authority theretofore declared and recognized as belonging to the old Court of Appeals.

Const. Sec. 112(5) gives the Circuit Court "original jurisdiction of all justiciable causes not vested in some other court." The petitioners say that because this proceeding was initiated as a declaratory judgment action the Circuit Court has jurisdiction. Our conclusion, however, is that except for matters in which the United States Supreme Court has the right of review over the judgments of this court, the jurisdiction to hear and determine any cause that has as its ultimate objective a judgment declaring what this court must do or not do is vested exclusively in this court, for the very simple reason that our Constitution makes it the highest court of the state and gives it the authority to "exercise control of the Court of Justice." It could not be said to possess such authority if it or its members in their official capacities were held subject to the authority of the Circuit Court or any other court of the state. The Circuit Court can have no more jurisdiction to issue a declaratory judgment than to issue a writ of mandamus or prohibition against this court or against its members and administrative staff in their official capacities.

According to a recent magazine article as recalled by this writer, it is the philosophy of a leading scholar and advocate who occupies a chair at the law school of one of the great universities of this country to "confront the government" wherever he finds it. The courts, of course, are a part of the government. Clearly, what the Public Advocate has sought in this particular instance is a confrontation with this court. But how does one "confront" a court? Every plaintiff or petitioner who institutes a legal proceeding asks the court to do something. If the court declines to do it, he is aggrieved.

He is, in fact, aggrieved by and at the court itself. But his only means of confrontation or redress is by way of an appeal; certainly he cannot sue the court. In any event, sooner or later he reaches the end of the line, and when the court that rejects his claim happens to be the court of last resort in that jurisdiction he finds himself with no place else to go, because there is no appeal from that court. It is precisely the same if the action is an original proceeding in a state supreme court. There is no appeal.[2] And fundamentally it is the same also when, as in this case, someone who wants something from the Supreme Court asks for it and is denied, whether the request be made by letter or by formal petition. The denial is final because there is nowhere else to go. Regrettable as it may be, all things mortal are destined to end at some time and at some place, some without further appeal and some without any appeal at all.

This does not mean, as suggested by the Public Advocate during the course of the oral argument, that the court is "above the law," or that it so regards itself. That hackneyed canard was bruited about and confounded long ago. The final authority to say what the law is must reside somewhere in any governmental structure. In our systems, state and federal, it resides in the judicial department. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch.) 137, 177, 2 L.Ed. 60 (1803). That this court is the final rung of the state's judicial ladder does not make it an oligarch, because even if the discipline of our profession were ignored, we simply could not bring it off.

"It may in the last place be observed that the supposed danger by judiciary encroachments on the legislative authority . . . is in reality a phantom. Particular misconstructions and contraventions of the will of the legislature may now and then happen; but they can never be so extensive as to amount to an inconvenience, or in any sensi-

---

2. The provision of Const. § 115 that in all cases there shall be allowed as a matter of right at least one appeal to another court obviously cannot apply to an original proceeding in the court of last resort.

ble degree to affect the order of the political system. This may be inferred with certainty, from the general nature of the judicial power, from the objects to which it relates, from the manner in which it is exercised, from its comparative weakness, and from its total incapacity to support its usurpation by force." *The Federalist,* No. 81.

In this state, judges like other public officers are elected by popular suffrage, and that is the ultimate protection against any supposed aggrandizement of power.

■ The petitioners evince shock and great umbrage that the members of this court, having already formed and expressed an adverse opinion by refusing to give that which was first demanded by letter, decline to declare themselves disqualified and vacate the bench now that the matter has been formally demanded by litigation. But we see no difference in principle from the participation by judges in the rehearing of a case in which they have rendered an opinion. Judges understand that they can be and at times are in error. If they were disqualified by reason of having made a previous ruling, most motions for a new trial and every petition for rehearing would call for a new judge or a new court. What we have done in this case is to reconsider our initial response to the Public Advocate's demand and to afford him an ample opportunity to present and argue the merits of that demand.

One further point and we shall leave off this tilting with procedural windmills. The petitioners apparently are of the impression that courts, as such, including of course this court, can be sued and that the judge or judges of the defending court are disqualified by reason of interest. We do not think so, in this jurisdiction at least. The function of a court is to resolve disputes, and it cannot have an interest or be an adversary party in a proceeding carried on within its own system. And if in this case now before it the court could be regarded as an adversary of the petitioners, how would matters be any different if its regular members saw fit to vacate the bench? The special members appointed temporarily to replace them would still constitute that same court and, perforce, they too would be disqualified.

In reality, what the petitioners have sought to do here is to appeal an action of this court to the circuit court with the objective of an eventual appeal back to this court, anticipating that the members of the court participating at the time of the initial decision would be replaced by others—in substance, a circuitous appeal from this court as regularly constituted to this same court as specially constituted. For the reasons already indicated, it cannot be done.

■ The further argument is made that because the members of this court were named as parties defendant in the proceeding as originally brought in the Franklin Circuit Court they became disqualified, not only by virtue of KRS 26A.015(2)(d)(1) but also by the principles of due process. Except for sheer ignorance, however, there is little to distinguish a suit brought in the Circuit Court against the Supreme Court and its members in their official capacities from a mere sham. It is constructive sham if not actual, the result being the same in either event. There can be no concealing that in this instance it was conceived and designed for the purpose of removing the members of the court from the consideration of a question that was their prerogative to decide. At the very most, the justices of the court were no more than nominal parties. Whatever interest they had, and have now, is strictly impersonal, and not of a substantive nature which might otherwise have been cause for disqualification. Cf. 46 Am.Jur.2d, *Judges,* § 111; *Commonwealth v. Murphy,* 295 Ky. 466, 174 S.W.2d 681, 683 (1943). It is true, as expressed in *In re Murchison,* 349 U.S. 133, 137, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), cited by petitioners, that "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome," but this case bears no resemblance to *Murchison,* or to *Commonwealth v. Murphy,* in which an amended petition alleged that the judge actually had aided and abetted the other defendants in their

conduct of illegal gambling activities. Here we have, on the merits, only a question of law. Even if it be conceded for sake of the argument that the viewpoint indicated by the court through its previous rejection of the demands made upon it was legally in error, that would not be a ground for disqualification. Cf. *Noe v. Commonwealth,* 267 Ky. 607, 103 S.W.2d 104, 106 (1937); *Sessmer v. Commonwealth,* 273 Ky. 40, 115 S.W.2d 337, 338 (1938).

The interest of this court and of its members is not to thwart or evade the law, but only to ascertain what it is, and whatever may be the answer, it is not a matter of personal concern or of such official inconvenience as would pose a ground for disqualification. We reject the claim that there is a violation of KRS 26A.015 or of due process.

Coming now to the question whether at this stage any of the petitioners has a legal right of access to the work-in-process accumulated by AOC, we presume that they have abandoned the notion that such access is contemplated or authorized by KRS 532.-075 itself. Quite obviously it is not.

■ On its face, the Open Records Law, KRS 61.870–61.884, incl. (Ch. 273, Acts of 1976), appears to apply. Whether its provisions conflict with or are harmonious with KRS 26A.200–26A.220, incl. (Ch. 22, Acts of 1976 Ex.Sess.), we need not decide, because we are firmly of the opinion that the custody and control of the records generated by the courts in the course of their work are inseparable from the judicial function itself, and are not subject to statutory regulation.

"It is elementary law, of course, that a court has the right to protect the integrity of its own records." *Gaston v. Collins,* 146 Kan. 449, 72 P.2d 84, 86 (1937). Not much has been written on this isolated principle (perhaps, indeed, because it *is* elementary), but the court touched upon it in *Summers v. City of Louisville,* 140 Ky. 253, 130 S.W. 1101 (1910). In that case the Jefferson Circuit Court, acting under statutory rule-

making power,[3] promulgated a rule permitting the city attorney of Louisville to have temporary custody of records in tax cases. The circuit court clerk contended that the rule conflicted with a statute requiring the clerk to "carefully preserve in his office all books and papers coming into his hands by virtue of his office."

In holding that the latter statute applied only while the records were in physical custody of the clerk, the court pointed out that the validity of the rule rested on the power of the court over its own records:

"But the records in the hands of the clerk are the records of the court. He holds them simply as the custodian of the court. The court can require its own records brought to the courtroom, or to a judge of the court, or to the office of its commissioner. So much of the rule is practically conceded to be valid. But the validity of this part of the rule does not rest on the necessity of the case, *but on the power of the court over its records.* The provision of the statute that the clerk shall carefully preserve all books and papers coming to his hands was not intended to interfere with the power of the court over its records, and means that he is to carefully preserve the records while in his custody. . . . The rule is simply a determination by the courts as to its own records." (Emphasis added.)

It is not our disposition to be jealous or hypertechnical over the boundaries that separate our domain from that of the legislature. Where statutes do not interfere or threaten to interfere with the orderly administration of justice, what boots it to quibble over which branch of government has rightful authority? We respect the legislative branch, and in the name of comity and common sense are glad to accept without cavil the application of its statutes pertaining to judicial matters, just as we accept KRS 532.075, even though it has been argued with much force that there is no constitutional basis for a statute enlarging

**3.** Since 1952 such power has been recognized in this state as exclusively judicial. Cf. Ch. 84, Acts of 1952.

the scope of appellate review beyond the matters of record in the proceeding under consideration. Cf. *American Beauty Homes Corp. v. Louisville, etc.,* Ky., 379 S.W.2d 450, 455 (1964).

The Open Records Law was enacted after this court had decided in *City of St. Matthews v. Voice of St. Matthews, Inc.,* Ky., 519 S.W.2d 811 (1974), that most public records should be and are open to public inspection. It was conceded in that opinion that ordinarily we look to the General Assembly for an expression of public policy in that area of governmental choice. However, with respect to records that belong to the courts and are a part of their ongoing work, the only conclusion consistent with the constitutional right of control over their own records is that the public policy must be articulated by the courts themselves. We do not believe that this viewpoint represents any actual conflict with the policy intended by the General Assembly itself. KRS 26A.200, which was enacted at a later date than was the Open Records Law, implicitly recognizes it. As a matter of fact, KRS 26A.200 was drafted by AOC.

But we do not intend to retreat from the wholesome principles expressed in *City of St. Matthews.* We fully appreciate that whatever belongs to the courts belongs to the public. In a fundamental sense we are only trustees, but in the sphere of authority that is constitutionally vested in the courts we are direct representatives of the public no less than is the General Assembly, or, for that matter, the Governor of the Commonwealth, to whom the public probably looks more for actual leadership and exercise of authority than to either of the other two branches of government.

■ There is very little in the policies evinced by the Open Records Law that we could not accept as a matter of comity. Some details of that law, however, present interferences that we regard as inconsistent with the orderly conduct of our own business, and those we do not accept. One is that we adopt and post rules and regulations. Cf. KRS 61.876. Another is that we conform to the procedure set forth in KRS 61.880. Still another is that as to the accessibility of our own records we adhere to the list of exceptions stated in KRS 61.878, and it is especially in this statutory section that we see an impediment to the efficient conduct of our work. KRS 61.878(1)(g) excepts preliminary drafts and notes, but KRS 61.-878(2) provides that there is no exemption for "statistical information not descriptive of any readily identifiable person." If this latter subsection means materials and data in the process of being accumulated, or which already have been accumulated, to the end that the court may select from it such portions as it deems pertinent for comparison with the facts of a case or cases to be reviewed by it, then a compliance with the statute would interfere with our work.

Every opinion from a casebook, every text or treatise, every law review article, every philosophical, historical or religious document a judge might see fit to read and consider, including the Holy Bible, is a tangible source of information from which he may pick and choose in arriving at a judgment. Fifty years ago lawyers and judges did not have at their disposal the sophisticated copying machines of today, but suppose that during the accumulation of facts, figures and studies which became the hallmark of his work the late Mr. Justice Brandeis had been obliged to let the lawyers and litigants make xerox copies of what lay on his library table from day to day. It would have been just about as outlandish a notion as a suit against the United States Supreme Court in one of the federal district courts.

From the standpoint of its effect upon the operation of the court, there would be no difference between permitting the Public Advocate to look at our work while it is in progress and permitting all lawyers to see what we are reading while we are working on their cases. The mere looking would be only the beginning. Why look, without the right to comment—that is, to participate in the court's deliberations? If the door were thrown open for lawyers, litigants, or anyone else to rummage through the papers on our desks, not only would the interruptions be intolerable, but

also the court would be deluged by floods of letters, supplemental briefs, motions for leave to file supplemental briefs, responses and further motions, all addressed to the subject of whether and why we might or might not to consider this, that or the other.[4] We simply cannot and will not have it.

According to the petitioners' brief, "No interest is served by continuing to hide these records." We shall let the insult pass, ascribing it more to stupidity than to insolence. This court has no reason to conceal anything. Indeed, not a member of the court has seen any of the material in question. We have not been advised and do not know what it contains or does not contain. The simple fact is that we are not ready to look at it yet, and we do not intend to be led to it in a halter. It is enough, meanwhile, to be engulfed in the morass of this asinine litigation.

One of the melancholy developments of the passing era has been the decline in respect exhibited by lawyers to each other and to the courts. Battles in court were just as hard-fought 40 years ago as they are today—perhaps more so—but the prevailing decorum had the flavor of old bourbon. Though it is no longer so refined, most lawyers still adhere to the traditional standards of professional savoir faire. Regrettably, there seem to be so many more exceptions. We have exercised great restraint toward the Public Advocate and his staff thus far,[5] but there are limits to the impudence that even this court will tolerate.

There is one fairly respectable argument in support of the petition. In *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court of the United States held that a defendant had been deprived of due process by the withholding of a confidential presentence report considered by the trial judge in sentencing him to death in the face of an advisory jury verdict recommending life imprisonment. There are obvious differences between individualized information pertaining to the defendant personally, which is to be considered by a trial judge in fixing a sentence, and the impersonal data that may be used by an appellate court in determining whether the judgment of a trial court is or is not in line with what has been done in comparable cases. Whether those differences would command significance in the eyes of the Supreme Court of the United States we cannot be certain. We can only guess, being fully conscious that we have not always been successful in similar efforts.

■ It seems to us that the difference is quite fundamental. If a judge or jury deciding one's fate is going to consider reports of what other people say about him, certainly he should be entitled to see them. "The risk that some of the information accepted in confidence may be erroneous, or may be misinterpreted, by the investigator or by the sentencing judge, is manifest." *Gardner v. Florida, supra,* at 430 U.S. 359, 97 S.Ct. 1205. But we are not the sentencing court. In any given case before us we intend to comply with the statutory request to include in our decision a reference to those similar cases that have been taken into consideration. Presumably, however, the petitioners want to know not only what will be taken into consideration, but what will not,[6] and to know it in advance, so that they can urge upon us what to choose and what to avoid. If they are constitutionally entitled to that much, perhaps they have

---

4. This, incidentally, is not the first time the Public Advocate has demanded access to materials generated by the court incident to its decision-making process. On prior occasions members of his staff have moved that we provide copies of recommendations prepared by our staff attorneys. These motions have been denied.

5. This again is not the first instance in which the Public Advocate or members of his staff have taken what this court regards as undue liberties in the form of insinuating remarks, resulting on one such occasion in a cautionary letter from the Chief Justice.

6. We are reminded of the apocryphal story of a conference long ago during which, after one judge of this court had looked at a case cited by another and said, "This case doesn't say that," the other judge grabbed up the book and retorted, "Show me where it doesn't say that!"

the further right to submit the individual members of the court to exhaustive questionnaires designed to discover and provide against their tastes and predilections. After all, "No fixed legal categories or concepts can wholly isolate this process of selection and shaping; on the contrary, the influence of any inquirer's biological and social matrices is an inevitable limitation on the 'purity' of his reasoning." Patterson, Edwin W., *Logic in the Law,* 90 University of Pennsylvania Law Review 875, 894 (1942).

 We do not find it possible to believe that in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Supreme Court of the United States meant to lay down a principle so pervasive as to require an appellate court to lay out for inspection by the appellant, even in a capital case, all of the information in its hands from which it may seek perspective and guidance in reviewing the propriety of his sentence. We therefore hold that *Gardner* does not apply.

It follows *a fortiori* that a defendant has no right to the production of this court's files for use at the trial stage. The Public Advocate contends that because it was observed in *Gregg,* 428 U.S. at p. 181, 96 S.Ct. at p. 2929, that the jury "is an objective index of contemporary values," this kind of information is relevant as trial evidence to which a defendant has the right of compulsory process. The fault in this line of reasoning lies in the premise that evidence of what has happened in other similar cases is, because it tends to indicate contemporary values, admissible in the trial of a capital case. So far as we are concerned, that is a preposterous notion and such evidence is not admissible in the trial of a capital or any other criminal case. There is nothing in *Gregg* from which it may reasonably be inferred that the necessary standards for guidance of the jury in a capital case extend beyond pointing to "the main circumstances of aggravation or mitigation that should be weighed *and weighed against each other* when they are presented in a concrete case." ALI, Model Penal Code

§ 201.6, Comment 3, p. 71 (Tent.Draft No. 9, 1959), as quoted with approval in *Gregg,* 428 U.S. at p. 193, 96 S.Ct. 2909. KRS 532.025 enumerates these factors and requires that they be embraced in the instructions to the jury. They do not and should not include what has happened to other defendants in other cases, at other times and in other places.

In keeping with our observation that the fundamental principles expressed in *City of St. Matthews v. Voice of St. Matthews, Inc.,* Ky., 519 S.W.2d 811 (1974), apply to the courts as well as to other governmental institutions, the materials compiled by AOC for this court pursuant to KRS 532.075(6) will be open to the public and, perforce, to all who may be interested, as soon as we have had the occasion and opportunity to examine and consider them ourselves. Until then, they are in the same category as any other source of knowledge or information, apart from the record of proceedings relating to an individual appellant, from which the members of the court may properly seek assistance or inspiration in the formulation of their judgments.

The petition is denied.

All concur.