Ned PILLERSDORF, Derek Gordon
and Jerry Anderson, Appellants,

v.

DEPARTMENT OF PUBLIC
ADVOCACY, Commonwealth
of Kentucky, Appellee.

No. 92–SC–449–DG.

Supreme Court of Kentucky.

Oct. 27, 1994.

Rehearing Denied Feb. 16, 1995.

Kevin M. McNally, Frankfort, Ned B. Pillersdorf, Prestonsburg, for appellants.

Joseph Vincent Aprile, II, Dept. of Public Advocacy, Frankfort, for appellee.

STEPHENS, Chief Justice.

The present action provides yet another twist in the ongoing chronicle concerning constitutionally mandated representation of indigent defendants and "who must pay." See *McCracken County Fiscal Court v. Graves* (92–SC–762–TG) and *Department for Public Advocacy v. Shadoan*, 885 S.W.2d 307 (1994). The issue in this case concerns the

authority of a trial judge to appoint counsel to represent an indigent capital defendant and to direct the state Department for Public Advocacy (DPA) to compensate the attorneys at the statutory hourly rates with no limitation on the maximum legal fees and expenses.

### FACTS

In September of 1986 Clawvern Jacobs was arrested and incarcerated on a capital murder charge. He was indicted by the Knott County Grand Jury for murder and other offenses in May, 1987. The record shows that at least from February, 1987, defendant Jacobs was represented pursuant to KRS 31.065(2) by two assistant public advocates, Neal Walker and Gary Johnson.

On July 9, 1987, Jacobs' counsel informed the Knott Circuit Court, Honorable John R. Morgan presiding, that based upon information gained from a psychological evaluation of the defendant by Dr. Elmer Maggard, they believed Jacobs to be "psychotic, delusional, and incompetent." The attorneys moved for a competency hearing on that issue. The motion was granted over Jacobs' strong objections. Four days later, Jacobs mailed a letter to DPA requesting the discharge of his attorneys who had "plead [him] insane" and "sold out [his] defense," and asked that new counsel be appointed. At the competency hearing on October 20, 1987, Jacobs' counsel tendered the letter to be filed with the record. During the same hearing, the Knott Circuit Court declared Jacobs to be incompetent to stand trial, and for that reason, deferred ruling on his request to discharge his counsel.

Less than one year later, after a period of hospitalization, evaluation, and various competency hearings, the trial court declared Jacobs to be competent to stand trial, and set a trial date of November 21, 1988. The issue of Jacobs' outstanding request to discharge his defense attorneys was considered by the Court at a pretrial hearing on October 21, 1988. Both Jacobs and counsel Walker, who wished to remain on the case,[1] addressed the court at that time. In an order entered

October 26, 1988, the trial court directed DPA to appoint new counsel for Jacobs within ten days.

On November 1, 1988, general counsel for DPA, J. Vincent Aprile, II, indicated in a letter to Judge Morgan the Department's intent to obtain substitute counsel within the time period specified by the order. The letter also expressed the general counsel's understanding that, presumably, the judge was directing the agency to "assign substitute counsel" pursuant to KRS 31.130, which provides for substitution in circumstances where there exists "good cause." Observing that the Knott Circuit Court's order of October 26, 1988, contained no reference to good cause, or that such a determination had been made, Aprile respectfully requested an order which included a good cause finding as "this office would be derelict in its responsibilities under the statute to act without that type of documentation." Aprile further observed that DPA had not received an order dismissing Counsel Walker from this case.

On November 23, 1988, Judge Morgan entered an order formally removing Mr. Walker as defendant's counsel. It is not known if this order contained a good cause finding. On November 29, 1988, the Knott County Commonwealth's Attorney moved the trial court to issue a show cause order in view of DPA's "contempt of the court's order of October 26, 1988" to appoint substitute counsel. On the same day, assistant public advocate Walker filed a motion for reconsideration of Judge Morgan's November 23, 1988, order removing him as counsel for Jacobs. A show cause hearing was held on December 13, 1988. DPA's general counsel filed a response expressing his agency's conflict in appointing new counsel at the same time their assistant public advocate's motion for reconsideration was under advisement by the trial court, and again, raised the issue of good cause. The response also included an affidavit by DPA's Personnel Administrator establishing that its Defense Service Division had suffered numerous resignations within the past six months, a circumstance which made it difficult for DPA to locate substitute

---

1. Co-counsel Gary Johnson was forced to withdraw from the case for health reasons.

counsel at that time. At that point, the Commonwealth voluntarily withdrew its show cause motion, and the court overruled counsel Walker's motion for reconsideration.

Only *six* days later, on December 19, 1988, the Knott Circuit Court entered an order, sua sponte, stating that because the Department for Public Advocacy was "unable to provide counsel," the court was appointing Ned Pillersdorf and Derek Gordon to represent Jacobs. The order further declared that DPA's "$2,500.00 cap" on compensation for such appointments "is arbitrary and in violation of appointed counsel's involuntary servitude rights ..." Accordingly, the court directed that newly appointed counsel would be compensated by the Department for Public Advocacy and the Kentucky State Treasury at the maximum statutory rate,[2] *with no cap,* along with reasonable and necessary expenses. DPA filed a motion for reconsideration of this order which the trial court overruled.

On April 18, 1989, the Knott Circuit Court sustained Mr. Pillersdorf's motion to withdraw as Jacob's counsel and appointed Jerry Anderson to replace him as co-counsel at the compensation rate reflected in its order of December 19, 1988.

By September 20, 1990, the three appellants had submitted compensation claims to the Department for Public Advocacy in the following amounts: Pillersdorf—$962.00; Gordon—$10,234.01 and Anderson—$7,231.25. In an order entered June 7, 1990, the court approved the claims and ordered DPA to pay them within twenty days. In an order entered June 26, 1990, the court upheld its previous order, and also entered a finding that statutory "special circumstances" existed in this case.

The Department for Public Advocacy filed a timely appeal in the Court of Appeals. A three-member Court of Appeals panel reversed the Knott Circuit Court, holding that "the circuit court failed to make findings of fact sufficient to sustain the order" in question. Counsel for appellants herein petitioned the Court of Appeals to hear the case en banc or, in the alternative, to have the original panel rehear the case. Both requests were denied. Appellants filed with this Court a motion for discretionary review, which we granted.

## WHETHER THE KNOTT CIRCUIT COURT LACKED AUTHORITY TO APPOINT APPELLANTS AS TRIAL COUNSEL FOR INDIGENT DEFENDANT JACOBS AND ORDER THE DEPARTMENT FOR PUBLIC ADVOCACY TO COMPENSATE APPELLANTS AT STATUTORY RATES WITH NO CAP.

It would only be forthright to begin our discussion of this issue by clarifying, in advance, that its specific resolution does not rest upon constitutional analysis. This is not a separation of powers case because, under these facts, no ultimate power of the judiciary (or any other branch of government) is in question. Neither is this case about involuntary servitude. There was nothing involuntary about appellants' service as counsel, and appellants will not remain uncompensated. This case is about the relevant provisions of the Kentucky Public Defender Act, KRS Chapter 31, and how to operate *within* its statutory framework.

KRS Chapter 31 is a comprehensive network of statutes enacted by the legislature in response to the dilemma created by both state and federal constitutional guarantees of effective representation for indigent defendants. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Smith v. Commonwealth,* Ky., 412 S.W.2d 256 (1967). The choice was clear: the state either must see that a defendant is provided counsel or it cannot proceed with a prosecution. *Jones v. Commonwealth,* Ky., 457 S.W.2d 627 (1970).

In *Bradshaw v. Ball,* Ky., 487 S.W.2d 294 (1972), this Court considered the question of whether the Commonwealth was required to compensate court-appointed attorneys repre-

---

**2.** *See,* KRS 31.170(3) and (4). Subsection (4) states that an attorney appointed by the court under subsection (3) "may be compensated at a rate no higher than thirty-five dollars ($35.00) an hour for time spent in court and no higher than twenty-five dollars ($25.00) an hour for time spent out of court ..."

senting indigent defendants. *Bradshaw* was a declaratory judgment action that evolved from two criminal felony cases wherein the respective trial judges entered orders awarding fees in specified amounts to court-appointed attorneys who had represented indigent defendants. When the State Commissioner of Finance and the State Treasurer refused to approve or satisfy the awards, both the state officials and the unpaid attorneys sought declaratory relief in the Franklin Circuit Court.

In agreement with the trial court we found that such compensation is constitutionally mandated. We held:

> It is in the public interest that the administration of criminal justice proceed fairly, impartially, expeditiously, and efficiently. Therefore, it appears elemental that the public interest in the enforcement of criminal laws and the constitutional right of the indigent defendant to counsel can be satisfied only by requiring the state to furnish the indigent a competent attorney whose service does not unconstitutionally deprive *him* of *his* property without just compensation.

*Id.* at 298. (Emphasis in original). Of equal consequence for the present case, the Court also addressed the separation of powers concern of where, in government, the practical task of providing effective counsel lies. Echoing the fundamental concept of the doctrine of separation of powers contained in No. 78 of The Federalist Papers,[3] we declared:

> In the context presented, we are persuaded that it is the duty of the executive department to enforce the criminal laws, and it is the duty of the legislative department to appropriate sufficient funds to enforce the laws which they have enacted. The proper duty of the judiciary, in the constitutionally ideal sense, is neither to enforce laws nor appropriate money. The

judiciary's reason for existence is to *adjudicate*.

*Id.* at 299. (Emphasis in original).

In 1972, the year of the *Bradshaw* decision, the General Assembly enacted the Kentucky Public Defender Act, KRS Chapter 31. In both sources of law, the allocation of responsibilities connected with the appointment of counsel for indigent defendants and the setting of fees are consistent with the separation of powers concept long ago expressed by Alexander Hamilton, and now embedded in our system of jurisprudence.

This opinion shall focus on Chapter 31, as it is the controlling authority in this case. As we shall see, Chapter 31 aptly mirrors this proper division of responsibility, by creating as its hub, the Department for Public Advocacy, an independent executive agency, and by legislating funds for legal representation of the needy.

### *KRS CHAPTER 31*

The complexity of the system of representation established by Chapter 31 as a whole is traceable to its parts. The act sets up a scheme whereby the executive duty of providing effective counsel for indigents can be met through various plans. The particular plan under which any single representation comes about dictates the rules and terms that·govern its fulfillment.

#### A. *County Fiscal Court Involvement Plans*

The most basic breakdown of the numerous schemes involves whether or not a county, through its fiscal court, chooses to become involved by implementing a local plan of representation under KRS 31.160.[4] A county may establish a local office to provide representation, *e.g.*, Fayette County Legal Aid. KRS 31.160(1)(b); KRS 31.170(1). A county fiscal court may choose to provide such services by contracting with one or more attorneys, or a nonprofit organization or association of attorneys, *e.g.*, Washington County

---

3. See The Federalist Papers (Rossiter edition, 1961).

4. Except under KRS 31.060, districts with ten or more circuit judges *"shall* establish and maintain

an office for district public advocacy ..." e.g. Louisville and Jefferson County. (Emphasis added).

Public Defenders Association. KRS 31.160(1)(a). *See also, Commonwealth v. Theodore H. Lavit and James H. Abell,* 882 S.W.2d 678 (1994). A county may also render services by employing a combination of these alternatives. KRS 31.160(1)(c). Finally, under KRS 31.160(2) and (3), "a county may join with one or more counties in its judicial district or elsewhere or with any cities located within said county or counties in providing the representation."

When a county fiscal court elects local involvement, the procedures by which the program it chooses shall be administered are set forth in KRS 31.160 through KRS 31.240. With all such plans, the statute affirmatively invests administrative oversight authority in the DPA to review and then approve, deny, or modify the submitted plan. KRS 31.050. This is an important point, for it illustrates the principle expressed in *Bradshaw,* and reaffirmed in the instant case, that the duty of providing counsel is in *executive function* relating to the enforcement of criminal laws. *See, Ex Parte Farley,* Ky., 570 S.W.2d 617, 620 (1978) ("The [Department] of Public Advocacy is, in fine, an agency of the executive branch of State government ..."). Finally, once a local plan is approved by DPA, KRS 31.050(2) provides that DPA may "allot a sufficient sum ... for the purpose of assisting the said plan."

## B. *Strictly DPA Plans—No County Involvement*

Under the Act, DPA is charged with the duty to ensure that services are provided to indigents in all 120 counties of the Commonwealth. KRS 31.030(5) and (6). Consequently, in counties which lack a local plan pursuant to KRS 31.160, DPA takes over at the helm. It provides services according to any one of a number of alternate plans authorized by the statute. It should be noted that in these counties, counsel services are rendered by DPA with no county involvement as far as the appointment of attorneys

or compensation for their services is concerned.[5]

Various district public advocacy systems may be established to service a "county containing less than ten (10) circuit judges or a group of counties ..." KRS 31.065. DPA, like county fiscal courts, is authorized to contract with one or more attorneys or an association of attorneys to represent indigent defendants in a designated area. KRS 31.065(1). Or the department may choose to maintain a branch district public advocacy office to service a particular area, staffed by its own state employees. KRS 31.065(2). The terms of compensation for contract attorneys under KRS 31.065(1) are authorized by KRS 31.070.

## The Present Case

Before addressing the merits of this case, one thought bears repeating: the particular plan under which any single Chapter 31 representation comes about dictates the rules and terms that govern its fulfillment. Here, for example, the issue of whether the Knott Circuit Court had the authority and jurisdiction to support its order, appointing appellants as Jacobs' counsel and setting their fee, depends upon whether the court was acting within the scope of those portions of Chapter 31 that are relevant to the plan under which indigent defendants *in Knott County* are provided legal representation. After consideration of the statute, as well as the arguments advanced orally and in the parties' briefs, we agree with the Court of Appeals that the order of the Knott Circuit Court must be reversed.

Since the Knott County Fiscal Court has declined to provide local legal defense services under KRS 31.160, defendant Jacobs was originally (and properly) provided with counsel under a "strictly DPA" plan pursuant to KRS 31.030(5) and KRS 31.065(2). Therefore, this Court's analysis is limited to the generally applicable statutes concerning indigent representation or those provisions ad-

---

5. County fiscal courts do, however, bear financial responsibility for payment of expenses and fees determined by a trial court to be "reasonable and necessary" to the representation of an indigent defendant. KRS 31.185; *Perry County*

*Fiscal Court v. Commonwealth,* Ky., 674 S.W.2d 954 (1984); *McCracken County Fiscal Court v. Graves,* (92–SC–762–TG), and *Department for Public Advocacy v. Shadoan,* (92–SC–826–TG), October 27, 1994.

dressed to representation borne solely by DPA, as opposed to the specific statutes which only apply to counties with fiscal court involvement.

Applying the law to the sequence of events evidenced by the record, it is clear that the Knott Circuit Court acted outside the statutory framework which governs its authority and jurisdiction in this case. While Judge Morgan's order is understandable in light of the delays in the case up to that point, the court simply did not have the prerogative, as the Court of Appeals stated, "to intrude as it did into the appointment or assignment process of the Department." What follows explains why.

### Substitution of Counsel

The facts prompting the challenged order, without question, raised the issue of substitution of counsel. The statute which governs this circumstance is KRS 31.130. It reads:

**Assignment of substitute attorney.**—At any stage, including appeal or other post-conviction proceeding, *the public advocate may for good cause* assign a substitute attorney. The substitute attorney has the same functions with respect to the needy person as the attorney for whom he is substituted. The court shall prescribe reasonable compensation for him and approve the expenses necessarily incurred by him in defense of the needy person, and shall if state compensation is desired, forward the request to the Office for Public Advocacy. (Emphasis added).

■ Here, defendant Jacobs had requested new counsel and continued to persist in his request for over one year. On the other hand, while there is evidence in the record that DPA was having difficulty finding substitute counsel due to vacancies in the Department and the $2,500.00 cap on counsel fees, there is also clear evidence that Jacobs rejected and refused to cooperate with the various other staff attorneys DPA did send

to talk with him. Further, when asked by the Court to explain his behavior, for the most part, Jacobs responded with delusional complaints.[6] In short, it is clear there was at least a legitimate dispute as to whether "good cause" to substitute counsel existed, as KRS 31.130 requires.

■ Although the statute does not explicitly state, we believe that whether "good cause" exists is a determination which lies within the discretion of the trial court. However, our review of the record fails to disclose any clear determination of good cause by the judge, a finding which under KRS 31.130, is necessary to trigger DPA's ability to provide substitute counsel:

10/26/88—*Order* that DPA provide new counsel within ten days—no good cause determination.

11/23/88—*Order* formally removing DPA counsel Walker from the case. While this order is missing from the record, neither party claims that the order contained a good cause finding.

12/13/88—*Knott Circuit Court calendar* documenting show cause hearing, at which trial court overruled Walker's motion for reconsideration of his removal as counsel and the Commonwealth withdrew its show cause motion—no good cause determination.

12/19/88—*Order* appointing appellants as defendant's counsel and setting fees—no good cause finding.

1/26/89—*Amended Order* in response to DPA's motion for reconsideration—mention of defendant's speedy trial right in light of DPA's "fail[ure] to provide counsel within a reasonable time ..."

From what appears in the record, the only evidence of good cause-type thinking on the part of the trial court is the "speedy trial" language which appears in the last order cited. We need not decide the adequacy of this brief reference to defendant's speedy trial right as a determination of good cause,

---

6. For example: Counsel was colluding with the state police in an assassination plot against him; counsel was trying to get him to deny his faith; counsel was an agent of the devil; and counsel tried to make him insane. *See, Henderson v. Commonwealth,* Ky., 636 S.W.2d 648 (1982) (an

indigent defendant "does not have a constitutional right to be represented by any particular attorney, and is not entitled to dismissal of his counsel ... except for adequate reasons or a clear abuse by his counsel.")

for its flaw lies elsewhere. Even if it were deemed sufficient to support the court's order directing substitution of counsel, it is posthumous in character. That is, it appears only after the trial court had *already appropriated* to itself the executive duty of appointing substitute counsel. In essence, the trial court failed to find good cause, the condition precedent to the vesting of DPA's statutory authority under KRS 31.130 to comply with its order. It then penalized DPA for not complying, and created the circumstance whereby it appointed appellants in contravention of the statute.

This is not to suggest that absolutely no circumstance exists in which a trial court, as a final recourse, could invoke its inherent judicial power, step *outside* the statutory framework and appoint counsel on its own. Appellants raise this question in their brief: "If the Public Advocate chooses not to supply attorneys when needed, or cannot do so, or assigns incompetent lawyers or an attorney with a conflict of interest, is a circuit judge to understand he is powerless to correct the situation?" Without hesitation, the answer is no.

■ However, as the Court of Appeals correctly suggested, it must be a last resort alternative. "Only then, when the Department fails or refuses to act, and all other means are exhausted, may the circuit court go outside of the statutory framework to make such appointments." In this case, for example, had there been a definitive determination of good cause and had the trial court concluded, after a show cause hearing and *finding of contempt*, that DPA was able, but refusing to provide counsel, a different result might well need to be obtained. Or had there been sufficient facts to conclude that DPA was literally unable to assign substitute counsel, judicial appointment of appellants would have been justifiable.

What is key is that under these suggested scenarios, a trial court, having done everything in its power to operate *within* the statute, could rightly exercise its inherent authority to provide effective counsel, and make the appointment. What is manifestly critical, however, is that a trial court proceed according to the mandates of the statute until there is simply no other option.

### *The Setting of Fees*

■ The challenged order, which improperly appointed appellants as counsel, further abridged established authority by setting counsel fees. In the December 19, 1988, order, the Knott Circuit Court held that DPA's "$2,500.00 cap on compensation for such appointments" is "arbitrary and in violation of appointed counsels [sic] involuntary servitude rights, as well as the 6th, 8th, and 14th Amendment Rights of the defendant to have competent counsel." The order further directed "The Department of Public Advocacy and the Kentucky State Treasury" to compensate appellants "at the rate of $35.00 per hour for in court time, and $25.00 per hour for out of court time, with no cap." As mentioned before, a later order found the existence of "special circumstances." Neither order provides an indication of the source of authority for the court's directive awarding fees, and appellants have pointed to none which supports it. Because there is law to the contrary, the order must be reversed on this ground, as well.

Once again, both case law and KRS Chapter 31 dictate the result. In *Bradshaw, supra*, after concluding that compensation was constitutionally mandated, this Court rejected the trial judge's ruling that "the ultimate responsibility to provide for compensation for court-appointed attorneys in the concerned circumstance is a required function of the judicial department of the government." *Id.* at 297. We stated unambiguously, "[I]t is the duty of the legislative department to appropriate sufficient funds to enforce the laws which they have enacted." *Id.* at 299.

In a case factually similar to the present case, *Department for Human Resources v. Paulson*, Ky., 622 S.W.2d 508 (1981), the Court of Appeals reaffirmed this principle. *Paulson* involved attorneys representing indigent parents in a parental rights termination action. The Fayette Circuit Court awarded attorney's fees which exceeded the $300.00 statutory fee set by KRS 199.603(8). The attorneys made claims for $1,447.00 and $1,220.00, respectively, which the trial judge

ordered the Department to pay. The Department for Human Resources appealed, relying on *Bradshaw.*

The Court of Appeals reversed, reiterating the constitutional break-down of the government's responsibility to compensate attorneys who provide indigent representation. In language strikingly applicable to the case before us, it stated:

> We conclude that [the setting of fees] was the proper and appropriate function of the legislature, and that by limiting the fee to this amount, neither appellee will be unconstitutionally deprived of his property or time. Acceptance of the appointment was voluntary, and the appellees had statutory notice of the limited fee.

We could not have said it better, ourselves.

Similarly supportive of the outcome, as well as the "theme" of this case—that trial courts must operate *within* the scheme of the statute—is the fact that nowhere in KRS Chapter 31 is a trial judge granted authority to set fees, chargeable exclusively to the state, that fall outside the fee parameters provided therein.

This is a KRS 31.065 case. This plan of representation, if properly proceeded under, looks only to DPA to orchestrate and administer the provision of counsel to needy persons. The amount of compensation for attorneys who provide services under KRS 31.065(2) is, in a sense, predetermined because DPA staff attorneys are on salary. *See* KRS 31.020(4). Attorneys operating under KRS 31.065(1) are under contract with DPA, the terms of which are limited by the amounts set forth in KRS 31.070. Should the unusual circumstance arise whereby a trial judge is forced to look outside the statute to appoint counsel, the maximum terms of state compensation and the procedure by which it is procured, are also dictated by KRS 31.070. It should be noted that, in keeping with the "strictly DPA" plan for representation, DPA must still review compensation claims submitted by judge-appointed counsel and approve or deny them. DPA also has a statutorily limited power to modify the certified request. KRS 31.070(3). Finally, and most importantly, "[t]he decision of the public advocate in all matters of fee and expense compensation *shall be final.*" *Id.* (Emphasis added).

Thus, by setting the fees appellants were to be paid and by ordering DPA to pay them, the Knott Circuit Court clearly failed to operate within the statutory compensation procedure applicable to Knott County. From the language and substance of its orders, it is fair to suggest that the authority under which the court *intended* to operate lies in KRS 31.170(3) and (4), which apply to counties with fiscal court plans for indigent representation. Subsection (3) discusses judicial appointment of attorneys. Subsection (4) prescribes compensation in amounts similar to those reflected in the orders. Also in (4), we find "special circumstances" language that allows for fees that exceed the statutory maximum stated therein. Appellants argue that this court should uphold the trial judge's orders by analogizing to the authority given to the court under KRS 31.170 (and which the trial judge apparently thought applied.) This we cannot do.

At the risk of redundancy to a fault, we again stress a guiding benchmark to the operation of Chapter 31: the particular plan under which any single representation comes about dictates the rules and terms which govern its fulfillment. KRS 31.170 is entitled: **Office For Public Advocacy—Establishment by *fiscal court.*** (Emphasis added). Since the fiscal court of Knott County has not adopted a KRS 31.160 local plan, KRS 31.170 does not and cannot apply in this case, by analogy or otherwise.

Even if it could apply, the trial court would still lack the authority to order DPA to pay the fees claimed by appellants. KRS 31.240(3) is clear that counties with a local plan may compensate attorneys at the rates prescribed by KRS 31.170 or at greater rates, but in either case, "the State contribution to such compensation *shall not be greater* than is provided for by *KRS 31.070.*" Counties must pay from their own funds all amounts in excess of the state contribution. KRS 31.240(1). Thus, even under appellants' analogy theory, DPA would remain free of liability for any amount over the statutory maximum.

## CONCLUSION

We offer a final thought to the readily conceivable protest that Chapter 31's counsel-appointment process as interpreted herein sanctions a scheme not unlike the proverbial "fox guarding the hen house." We agree. The long and short of it is that DPA, indeed, wears two hats. In this respect, the statute is unambiguous. We thus feel it appropriate to emphasize that DPA's duty to provide counsel is an executive agency function. It is an obligation which exists independently of and apart from DPA's responsibilities as advocate—and must be so kept. Any hint of tactical compromise of a defendant's constitutional right to a speedy trial due to potential confusion between hats will be closely scrutinized, and simply not tolerated.

It is the obligation of this Court to interpret the law in difficult cases and in the face of what may appear to be harsh results. In this case, KRS Chapter 31 is, without question, the controlling authority. It is comprehensive and complex, as is the task it undertakes to accomplish. While it is not "perfectly" written—and what body of statutes is—we think it is correct in concept and workable in practice.

For the above stated reasons, the decision of the Court of Appeals is affirmed. The order of the Knott Circuit Court directing the Department of Public Advocacy to compensate appellants in the amounts stated therein is hereby reversed on the ground that the trial court lacked the authority and jurisdiction to issue it. Pursuant to the mandate of *Bradshaw*, that attorneys representing indigent defendants not remain uncompensated, this case is referred to the Public Advocate of the Commonwealth of Kentucky for a determination of reasonable state compensation in accordance with DPA guidelines and KRS Chapter 31.

LAMBERT, REYNOLDS, SPAIN and WINTERSHEIMER, JJ., concur.

SHERRY BRASHEAR, Special Justice, and LEIBSON, J., dissent in a separate dissenting opinion.

STUMBO, J., not sitting.

SHERRY BRASHEAR, Special Justice, and LEIBSON, Justice, dissenting.

Respectfully, we dissent. For the reasons set out below, we would reverse the Court of Appeals and affirm the Knott Circuit Court.

The substantive issue in this appeal, to borrow from the language of both the majority of this court and that of the Court of Appeals, is whether Knott Circuit Judge Morgan had the prerogative to intrude upon the function of providing counsel to indigent criminal defendants assigned to the Department of Public Advocacy (hereinafter DPA) by the legislature's enactment of Chapter 31 of Kentucky Revised Statutes. We agree with Judge Miller of the Court of Appeals that the creation of the DPA did not divest the Knott Circuit Court of its inherent ability "to do all things reasonably necessary to the administration of justice in the case before it." *Smothers v. Lewis*, Ky., 672 S.W.2d 62, 64 (1984).

The members of the majority have allowed themselves to be beguiled by the attractive convolutions of Chapter 31, much as the Aegean sailors were diverted by the Sirens. Once lured into its complexities, however, ratiocination is doomed. While Chapter 31 seems to fill the entire perceptual field, and to engulf every set of facts held up to it, it fails to cover all possibilities, including present circumstances. Hence, the majority has been led, mistakenly, to conclude that, in every circumstance, a trial court must bow to the DPA both in the appointment and compensation of counsel to indigents accused of crimes.

Though the majority denies that this case concerns either the separation of powers doctrine or the ultimate power of the judiciary, it frequently and repeatedly alludes to the discussion of these concepts in *Bradshaw v. Ball*, Ky., 487 S.W.2d 294 (1972). *Bradshaw* states "[t]he judiciary's reason for existence is to *adjudicate*," not to "appropriate money," *Id.* at 294 (emphasis original), but it does not exclude the power and responsibility inherent in the judiciary to do all that is necessary to carry out this *adjudicatory* power. This includes mandating payment from the State Treasury when such payment is essen-

tial for the judiciary to function and when those in the executive and legislative branches have failed their constitutional duty to provide services necessary to carry out the judicial function.

While we believe the facts of this case are more critical to its determination than any judicial philosophy, we must also acknowledge that the integrity of the judiciary as one of the three coequal branches of our government lies at the heart of the matter. For it is the independence of the judiciary that empowered Judge Morgan to appoint appellants and order they be paid.

In *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the United States Supreme Court located in the U.S. Constitution a mandate that those accused of crimes be provided counsel. Nine years later, in *Bradshaw v. Ball, supra,* we concluded that the Kentucky Constitution likewise requires that counsel for indigent criminal defendants be compensated for their representation. Despite finding the system of court-appointed, uncompensated counsel an unconstitutional deprivation of property, we reversed the court's payment of fees. But *Bradshaw v. Ball* was decided "[i]n the context presented," and critical to that "context" was the court's finding that "the Kentucky Public Defender Act of 1972 appears to provide means adequate to observe the required standards, *if that act is properly construed, administered, and promptly put into operation.*" 487 S.W.2d at 299. (Emphasis added). In this case the coequal branches of government *failed* to carry out these necessary contingencies expressed in *Bradshaw v. Ball.* Implicitly, the trial court has so found and the record supports such a finding. The judiciary then must exercise its inherent power as necessary to carry out its "reason for existence," its assigned function "to *adjudicate*" (*Bradshaw v. Ball,* as quoted, *supra*). Under *Bradshaw v. Ball* the attorneys then appointed must be paid a reasonable fee for their services, since otherwise "the burden of such service [is] a substantial deprivation of property and constitutionally infirm." *Id.,* at 298.

The majority in this case implies that the separation of powers doctrine requires us to abdicate wholly to the legislature in the appointment and payment of counsel for accused indigents. In fact, the separation doctrine requires the opposite: it demands that the judiciary maintain the coequal status conferred by Section 109 of the Kentucky Constitution by protecting its inherent powers from the interference of the executive and legislative departments. In *Smothers v. Lewis,* Ky., 672 S.W.2d 62 (1984), this court repeated the "well settled law in the state . . . that one branch of Kentucky's tripartite government may not encroach upon the inherent powers granted to any other branch." *Id.* at 64. In declaring unconstitutional a statute that forbade courts to enjoin revocation of liquor licenses during an appeal, we stated that "a court . . . has, as an incident to its constitutional grant of power, inherent power to do all things reasonably necessary to the administration of justice in the case before it." *Id.* The inability of the legislature, by enactment, to annul and supplant inherent judicial authority has repeatedly been stressed by this court. *E.g., Commonwealth v. Furste,* 288 Ky. 631, 157 S.W.2d 59 (1941); *Craft v. Commonwealth,* Ky., 343 S.W.2d 150 (1961). *Accord Wells v. Gilliam,* 196 F.Supp. 792 (E.D.Va.1961) ("In the administration of justice, the judge is charged with the preservation of order in his court and to see to it that justice is not obstructed by any person or persons whatever. Indeed, it is a power inherent in any court.")

In recent years, many courts have construed as inherent in the constitutional grant of power to the judiciary the power both to appoint counsel for indigent criminal defendants and to compel payment of their fees. *See Young v. United States,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (to vindicate their authority, courts have inherent authority to appoint counsel to prosecute contempt actions); Annot., 59 A.L.R.3rd 569 (1980 & Supp.1993) (collecting cases on the inherent power of courts to compel expenditure of funds for judicial purposes). Many courts have determined that the inherent power of the judiciary to ensure the orderly administration of justice permits them not

only to appoint counsel for accused paupers, but also to direct their fees be paid by a governmental entity and to award a fee in excess of statutory limits. *See, e.g., Knox County Council v. State,* 217 Ind. 493, 29 N.E.2d 405 (1940) (to carry out "purpose of their creation," courts may appoint counsel and order county to compensate them); *People v. Randolph,* 35 Ill.2d 24, 219 N.E.2d 337 (1966) (court may order payment of counsel as necessary incident of inherent power to appoint and payment may exceed statutory maximum); *State v. Lehman,* 137 Wis.2d 65, 403 N.W.2d 438 (1987) (court had inherent power to appoint counsel when public defender refused assistance and to order payment of fee by county as court operating expense); *Board v. Curry,* 545 So.2d 930 (Fla.1989) (attorney's fee in excess of statutory maximum was authorized by judiciary's inherent power to ensure adequate representation for indigent criminal defendants).

There is much to deplore and much with which to sympathize in the situation that confronted Knott Circuit Judge Morgan in December of 1988. Clawvern Jacobs, accused of capital murder, had been jailed in September of 1986. He was not indicted, however, until some eight months later, in May of 1987. Prior to the indictment, two assistant public advocates had undertaken to represent Jacobs. When they moved for a competency hearing, in July of 1987, he requested their discharge. After the hearing, in October of 1987, Judge Morgan declared Jacobs incompetent to stand trial. He did not entertain Jacobs' request to discharge his counsel until a year later, after evaluations and subsequent hearings convinced the judge of Jacobs' competency, and a trial had been set for November 21, 1988.

At a pretrial conference on October 21, 1988, Judge Morgan took up Jacobs' request to discharge his defense attorneys, which had been reiterated by Jacobs in court at the final competency hearing in August of 1988. A few days later, he ordered the DPA to appoint new counsel within ten days. When, over a month later, substitute counsel had not been assigned, the prosecution moved for a show cause order. At the same time, one of Jacobs' defense attorneys sought to have the order removing him set aside. Further, at the show cause hearing, on December 13, 1988, the DPA showed opposition to the removal of the attorney whose discharge Jacobs had demanded and filed an affidavit demonstrating the difficulty of obtaining replacement counsel from within the Department.

No wonder Judge Morgan took the matter into his own hands by appointing counsel for Jacobs and prescribing how and by whom they would be paid. Jacobs had been incarcerated for over two years and had, finally, after a year, been found competent to stand trial. Jacobs denounced the DPA lawyers as having "pled [him] insane" against his wishes and tape recorded him without his knowledge. Moreover, Jacobs asked his lawyers to "file a motion for a speedy trial," and they did not. Such a motion, if filed, required Jacobs to be brought to trial within 180 days. KRS 500.110. The finding of competency gave the court little choice but to respect Jacobs' demand that his prior counsel withdraw. A trial was scheduled, so expedition was obviously required in the appointment of substitute counsel. Nevertheless, the court's order requiring the DPA to act with haste was at first ignored and then met with a somewhat peculiar resistance that must have appeared to Judge Morgan to amount to a refusal to act. Not only did the DPA oppose the removal of Jacobs' prior DPA-provided counsel, but it also hinted strongly that it would be unable to find a replacement for him due to personnel problems.

Judge Morgan was left with no choice but to exercise his inherent power as a judicial officer to ensure the orderly administration of justice in his court, both for Jacobs and for the citizens of the Commonwealth whose peace and dignity Jacobs was accused of having disrupted. The Judge's authority to do as he did is a natural incident to the powers vested in the Court of Justice by Section 109 of the Kentucky Constitution. This authority exists regardless of the enactment of Chapter 31 creating the DPA and is

not displaced by it. Moreover, the inherent power to appoint counsel must carry with it the obligation to direct meaningful payment for appointed counsel's services. Otherwise, the requirement of *Bradshaw*, that an indigent accused be provided an attorney whose service does not deprive that attorney of his property without just compensation, remains unfulfilled.

Finally, in directing that appellant's attorney fees be paid Judge Morgan did not, as the majority implies, arrogate to himself the legislative function of appropriating funds to enforce the laws. The appropriation had already been made by the legislature in funds budgeted to the DPA. Judge Morgan merely ordered payment from funds already earmarked by the executive and legislative branches for the purpose for which Judge Morgan directed they be paid: representation of indigent criminal defendants. The fact the fees exceeded the statutory cap does not render the judge's order a controversion of the separation of powers. He wielded a power possessed by all trial judges that exists apart from Chapter 31, but which remains dormant so long as the DPA properly performs its statutory duties. Judge Morgan's inherent authority was activated when the DPA did not promptly take steps to comply with Jacobs' request and obtain other counsel for him once he was deemed competent and a trial scheduled. We would reverse the decision of the Court of Appeals and remand the case to the Knott Circuit Court for enforcement of its order directing payment to appellants of the fees requested by them.