Penny L. KUPRION, Appellant,

v.

Hon. Richard J. FITZGERALD, Judge,
Jefferson District Court, Division
14, Appellee,

and

Robert G. Kuprion, Real
Party in Interest.

No. 94–SC–334–MR.

Supreme Court of Kentucky.

Nov. 23, 1994.

As Amended Nov. 28, 1994.

Ted W. Spiegel, Thomas A. McAdam III, Louisville, for appellant.

Maureen Ann Sullivan, Louisville, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a decision of the Court of Appeals which denied a writ of mandamus challenging the constitutionality of what is known as the Jefferson Family Court, seeking to have the "Family Court" declared unconstitutional and requiring the "Family Court Judge" to transfer the case to a division of the regular circuit court.

The issues presented are whether a district judge lacks subject matter jurisdiction to grant a decree of dissolution; whether the Chief Justice can grant district judges the power to hear dissolution cases; whether the Jefferson Family Court violates Sections 27 and 28 of the Kentucky Constitution; whether the appellant is denied equal protection of the law under the Federal and State Constitutions and whether the Court of Appeals erred in denying mandamus.

On April 29, 1993, Penny L. Kuprion filed a petition for dissolution of marriage with the clerk of the Jefferson Circuit Court. A decree of dissolution was entered on April 29, 1994. Pursuant to the computerized system used by the clerk, the matter was assigned to the Jefferson "Family Court" to be presided over by the Honorable Richard J. Fitzgerald, a Jefferson County District Judge. Claiming

that the "Family Court" was unconstitutional, she moved the Family Court Judge to reassign the matter to Jefferson Circuit Court. Her motion was denied. She then sought a writ of mandamus to request that her case be reassigned to the Jefferson Circuit Court and that the Family Court project be declared unconstitutional. The Court of Appeals denied mandamus and this appeal followed.

Our task is to determine the nature of what has been established in Jefferson County and whether it passes constitutional muster. We cannot deem a legislative resolution or judicial order constitutional merely because it may seem in our view to be expedient, necessary or wise, or even if it enjoys strong popular support. The Kentucky Constitution is, in matters of state law, the supreme law of this Commonwealth to which all acts of the legislature, the judiciary and any government agent are subordinate. It is our responsibility to consider only whether the action meets or violates constitutional requirements.

The Kentucky General Assembly, on March 31, 1988, passed a concurrent resolution directing the Legislative Research Commission to appoint a Task Force to examine the need for and feasibility of establishing a Family Court or division of court. 1988 Ky. Acts Ch. 128, HCR 30.

It should be observed that members of the public and even the legal profession might easily be lulled into the colloquial concept of "Family Court." The better definition would be to label it as a "Family Court Project." It should be recalled that within district court there are already the titles of "traffic court" and "probate court," as well as "juvenile court" and "small claims court," which were created by statute. KRS 24A.110(1); KRS 24A.120(2); KRS 24A.130; KRS 24A.230.

The Task Force was directed to make findings and conclusions, including summaries of any legislation it might recommend. The 16–member Task Force included five members of the General Assembly and, after due consideration, recommended that rather than immediately create a Family Court in Kentucky, a pilot Family Court project be initiated; that the pilot project be implemented by the Court of Justice; that the Chief Justice select the district judges; and that the 1990 General Assembly fund the project, including implementation and evaluation.

The Task Force report in 1989 amplified the preamble to the concurrent resolution which established it by making ten findings, including the idea that fractionalization of family jurisdiction leads to a waste of time and delays, that it increases the time and expense involved in these cases and creates an inordinate delay between intake and final resolution.

The Task Force recommended to the Supreme Court and to the General Assembly that the Supreme Court establish by rule, a pilot project for the 1990–92 biennium with at least one urban and one rural location and that the General Assembly fund the project. The recommendations of the Task Force were first implemented in Jefferson County where, once a family dispute entered the system, all matters related to it were to remain with the one judge who was initially assigned to the case.

The procedure of using an experimental Family Court Project to study the feasibility prior to establishment by the legislature or constitutional amendment reflects the practice followed in Florida, New York and Virginia.

In 1991, the Chief Justice selected three circuit judges to be sworn in as special district judges and three district judges to be sworn in as special circuit judges. His order of March 20, 1991 contains the language "This appointment shall remain in effect until further order of this Court." The Supreme Court of Kentucky subsequently approved rules of practice for the Jefferson Family Court. Currently the Family Court project hears 75 percent of the actions for dissolution of marriage, and 25 percent are heard in the circuit court. In 1994, the General Assembly increased funding to permit the size of the project to increase from six to eight judges in July, 1994. It is expected that all new dissolution actions will be placed in the Family Court project rather than on the regular circuit court docket. The Family Court pro-

ject continues to hear all adoptions, terminations of parental rights, dependency/neglect, paternity and juvenile matters.

The assignment of judges to the Family Court project is made on a voluntary basis. The district judge in this case, as well as all other district judges who have been appointed as special circuit judges, have the necessary constitutional qualifications to serve as circuit judge. Ky. Const. § 122.

■ Penny L. Kuprion claims that a district judge lacks subject matter jurisdiction to grant a decree of dissolution of marriage. She cites Section 113(6) of the Kentucky Constitution and KRS 24A.110–130; KRS 406.021 and KRS 406.140. We must agree that a district judge in his capacity as district judge has no jurisdiction to hear a dissolution case. However, in this situation the district judges involved are properly sworn as special circuit judges pursuant to Section 110(5)(b) of the Kentucky Constitution in order to hear cases which fall within the exclusive jurisdiction of the circuit court. The district court cannot hear divorce cases; Only the circuit court has that power.

■ It is inherent in the nature of the judicial branch that in a multi-judge court, the actions of a single member including the Chief Justice acting in an administrative capacity are subject to review. The reviewing court can take notice of a presumption of regularity to be accorded to the actions under review which does not preclude a review of the substance and constitutionality of such actions. Here the actions and orders of appointment were not improper. Accordingly, we now consider the constitutional aspect of the actions.

■ We must reject her claim because Section 110(5)(b) in pertinent part states that the Chief Justice shall assign temporarily any justice or judge of the Commonwealth to sit in any court other than the Supreme Court when he deems such assignment necessary for the prompt disposition of causes.

She also argues that the Chief Justice may not use Section 110(5)(b) to appoint a district judge as a temporary special circuit judge in order to hear dissolution actions under the authority of the Jefferson Family Court pro-

ject because KRS 26A.020 provides in part what is to take place when a judge is unavailable to perform judicial duties.

We disagree. The appellant can cite no authority for the proposition that unavailability of a sitting judge is the sole grounds on which the Chief Justice can make a temporary appointment for the prompt disposition of causes. This Court sustained the appointment of a retired circuit judge as a special judge to allow him to complete his caseload despite the fact that his successor had already taken office. *Regency Pheasant Run Ltd. v. Karem,* Ky., 860 S.W.2d 755 (1993).

The Chief Justice has also appointed a retired circuit judge as a special circuit judge to hear the voluminous asbestos litigation in Jefferson Circuit Court because it would otherwise clog the dockets of every division of that court. *Huntzinger v. McCrae,* Ky.App., 818 S.W.2d 613 (1991), permitted a chief regional circuit judge to appoint a special circuit judge from outside the region. Although it is unclear whether the regular circuit judge was unavailable to sit, that panel of the Court of Appeals found that the fact that the Chief Justice had not appointed the special judge was not a material departure from the statute and upheld the special judge's dismissal of a complaint.

It should be remembered that Section 109 of the Constitution established a trial court of general jurisdiction, known as a circuit court, and a trial court of limited jurisdiction, known as the district court, as the only trial courts in Kentucky. Those two courts, together with the Supreme Court and the Court of Appeals, are the only judicial entities into which the single Court of Justice shall be divided. Section 113 of the Constitution provides that the General Assembly shall determine jurisdictional limitations for the district court and Section 112 provides that appellate jurisdiction shall be assigned to the circuit court as provided by law. The circuit court also exercises all other original jurisdiction not vested in some other court. It is further recognized that the legislature has no power to create a court not provided by the Constitution. *Hoblitzel v. Jenkins,* 204 Ky. 122, 263 S.W. 764 (1924).

We must conclude that KRS 26A.020 does not limit the appointment power of the Chief Justice pursuant to Section 110, but only establishes a procedure by which it is to be exercised when a judge is actually unavailable to sit.

 Section 110(5)(b) provides the necessary authority for the Chief Justice to assign a judge temporarily to any court other than the Supreme Court for the prompt disposition of causes. The discretion of the Chief Justice in making such an appointment is limited to that necessary for the prompt disposition of causes. In this case, such discretion was supported by the report of the Family Court Feasibility Task Force and the adoption of HCR 30.

██ The second prong of Penny Kuprion's argument against the validity of Judge Fitzgerald as a special circuit judge is that the order of the Chief Justice dated March 20, 1991 is not temporary because it did not give a date certain on which the appointment would expire. The order recites that the appointment shall continue "until further orders of the court."

██ Section 110(5)(b) of the Constitution does not confer unbridled, absolute or unlimited power on the Chief Justice in his capacity as Chief Executive of the court system. The Section refers only to temporary appointments of judges to provide for the prompt disposition of causes. It should be pointed out that the word "temporary" relates only to the appointment of the judge. In no way can a temporary court be created by an order of the Chief Justice. Such an extraordinary action must be rooted in fact and the reason for the temporary appointment should be noted in the order of appointment. Section 113(6) states that the grant of jurisdiction for a district judge comes from the General Assembly and not from any other entity. The appointment of special judges has a foundation in the language of Section 115.

The situation here is that the Family Court project is a concurrent session of the already existing district and circuit court divisions and is convened in response to HCR 30. The purpose of the project is to deter-mine if domestic cases involving aspects of family relations can be adjudicated more effectively under the so-called "one judge, one family" approach. The project is based on the temporary assignment of district and circuit judges as special judges to serve in a temporary capacity. No new divisions of the court have been created.

Penny L. Kuprion maintains that a new court has been created. The concurrent resolution considered both the possibilities of the development of a court or a division of court, leaving open the possibility that the ultimate solution of the problem faced by the Task Force might be a constitutional amendment creating a truly new court. This argument might have been rendered moot if the Task Force and the orders of this Court used the word "division" as in the case of the creation of a Small Claims Division of district courts. *See Hibberd v. Neil Huffman Datsun, Inc.*, Ky.App., 791 S.W.2d 726 (1990). It is obvious that the use of the word "court" does not by itself make a court any more than the "four courts" mentioned in the Constitution are in addition to the Unified Court of Justice. The words might have been used more precisely, but they do not give rise to any constitutional infirmity.

A particularly telling aspect of the temporary nature of this situation can be seen in the necessity for legislative funding of this project in each biennium as part of the judicial budget. This funding could be suspended by any succeeding General Assembly. *Hayes v. State Property*, Ky., 731 S.W.2d 797 (1987). The cases which have considered the relationship between budget questions and statutes reflect the fact that budgeting can be in many ways the most dramatic means by which a legislature can express itself. *Cf. Commonwealth, ex rel Armstrong v. Collins*, Ky., 709 S.W.2d 437 (1986); *Smith v. Kentucky State Racing Com'n*, Ky.App., 697 S.W.2d 153 (1985). "Since the budget is the principal instrument of resource allocation and policy planning, it reflects state government's public policy priorities." *See* P. Miller, *Kentucky Politics and Government: Do We Stand United* (1994) at p. 227.

The introduction of Senate Bills 83 and 84 by the 1994 General Assembly and the ad-

journment of that body without having acted upon the legislation is of no consequence in our consideration. It is mere dicta to say that it would be helpful if the General Assembly had indicated a time frame in which to conduct the Family Court project and had required a report to be submitted to it within that time frame. However, it does not affect our consideration of the concept of a temporary appointment.

The word "temporary" means transient or passing but not permanent. *Cf. Rogers v. City of Louisville*, 296 Ky. 238, 176 S.W.2d 387 (1943). "Temporary" is a word of much elasticity and it has no fixed meaning in the sense that it designates any fixed period of time. *Kahn v. Lockhard*, Mo., 392 S.W.2d 30 (1965). Perhaps the most colorful definition of the word "temporary" is "for a brief period of time, transitory, or limited, or on the highway of time, a cul-de-sac, but not a limitless boulevard of eternity." *Simplex Precast Industries, Inc. v. Biehl*, 395 Pa. 105, 149 A.2d 121 (1959).

Here the appointment of a special judge is for an indefinite time, but the language of the order limits the appointment by stating "until further order of the Court" which recognizes that upon the occurrence of some event the appointment will cease to exist. The Chief Justice has not exceeded his constitutional authority.

A very old Arkansas decision indicated that a judicial reassignment statute would be unconstitutional because "temporarily" in the state constitution is not a permanent or lasting interchange of judges. *Knox v. Beirne & Burnside*, 4 Ark. (4 Pike) 460–464. The power of the Chief Justice is not absolute. It must be exercised under the authority granted by the constitution and is subject to review by the entire Supreme Court. The use of the authority is simple because the power is simply stated in the Constitution. The authority is fact related to the prompt disposition of causes with some element of discretion.

■ We must pause to consider the status of the actions of the Chief Justice. We find them to be acts of discretion that are not an abuse of that discretion. By means of comparison, we frame our standard of review along the lines of a clear abuse of discretion by a trial court. The term is usually related to trial court activities, but can be applied to the use of judicial authority in any respect, particularly when the authority is conferred by the Constitution. "Abuse of discretion in relation to the exercise of judicial power implies arbitrary action or capricious disposition under the circumstances, at least an unreasonable and unfair decision." *Kentucky National Park Com'n v. Russell*, 301 Ky. 187, 191 S.W.2d 214 (1945) (referring to *Harvey Coal Corp. v. York*, 252 Ky. 605, 67 S.W.2d 977 (1934)). *See Also City of Louisville v. Allen*, Ky., 385 S.W.2d 179 (1964). The exercise of discretion must be legally sound. *See* 5 Am.Jur.2d § 774 *Appeal and Error* P. 217 (1962).

*City of Louisville v. Allen*, Ky., 385 S.W.2d 179 (1964), provides a number of very sound definitions for the term "discretion."

" 'Discretion' of court is a liberty or privilege allowed to a judge, within the confines of right and justice, to decide and act in accordance with what is fair, equitable, and wholesome, as determined by the peculiar circumstances of the case...." Cited in *In re Welisch*, 18 Ariz. 517, 163 P. 264 (1964 [1917]).

"This discretion, when applied to a Court of Justice, means sound judicial discretion guided by law.... It must not be arbitrary, vague and fanciful, but legal and regular." *Watt v. Stanfield*, 36 Idaho 366, 210 P. 998, 1000 (1960 [1922]).

"Discretion implies that in the absence of positive law or fixed rule the judge is to decide a question by his view of expediency or of the demands of equity or justice. Citing *People v. Surplice*, 203 Cal.App.2d 784, 21 Cal.Rptr. 826 [ (1962) ]."

■ The need to address the problem of what has come to be known as "Family Court Practice" was demonstrated by the Task Force in sufficient detail. The authority of the Chief Justice is established by Sections 110 and 116 of the Constitution. The Chief Justice was within his constitutional authority to accept the report of the Task Force and then to exercise his sound discretion as to

how and where to implement the request of the Task Force.

■ The third argument is that the Jefferson Family Court project violates Sections 27 and 28 of the Kentucky Constitution and is therefore unconstitutional. The issue is whether the establishment of the Family Court project has usurped the legislative power to assign jurisdiction of subject matter to the circuit court as provided in Section 109 of the Constitution and detailed by KRS 23A.010.

It involves the question of whether the Family Court project is a separate judicially created court within the Court of Justice and consequently unconstitutional despite the legality of appointment pursuant to the Constitution.

It should be observed that the judicial amendment of 1975 and the constitutional sections created by it may have resulted in some overlap of authority. See D. McSwin, note, *Judicial v. Legislative Power in Kentucky: A Comity of Errors*, 71 Ky.L.J. 829 (1983). However, there has never been any question that the Supreme Court has authority to act upon its responsibilities pursuant to Section 110 of the Constitution. *Ex Parte Farley*, Ky., 570 S.W.2d 617 (1978); *Regency Pheasant Run, Ltd., supra.*

There is legislative authorization through which HCR 30 delegates authority to the Legislative Research Commission to appoint a Task Force to study the establishment of a court or division of court devoted to family law problems and the management and resolution of family law cases. The Task Force recommended that the Chief Justice supervise the project in his capacity as head of the Court of Justice pursuant to Section 110(5) of the Constitution. The pilot project was developed using the existing judicial resources in the only constitutional manner available. The Chief Justice cannot and did not create any new judges or any new courts.

The Family Court project does not establish a new or separate court pursuant to Section 109 of the Constitution. The project has resulted in a constitutionally authorized judicial unit known as Family Court which uses judicial resources already in existence.

Thus it complies with Sections 27 and 28 of the Constitution in preserving the separation of powers. The use of temporarily assigned judges who are already a part of the Court of Justice complies with Section 109 of the Constitution. Consequently the Family Court project is constitutional.

■ Penny L. Kuprion has not been denied equal protection of the law guaranteed by the Federal and State Constitutions. She has not suffered any discrimination by virtue of having her case assigned to an elected district judge sitting as an approved special circuit judge in the Family Court project. Such a submission could have resulted regardless of whether the cases were assigned alphabetically or in any other manner. It must be remembered that the hearing judges who may have been elected as district judges are not serving in that capacity but rather as special circuit judges pursuant to a proper appointment by the Chief Justice. The district judges involved in this project hear divorce and custody cases in their capacity as special circuit judges only.

Although the question of alphabetical discrimination may be real in some circumstances, it is not prejudicial here and does not require any interference with the Family Court project. There is no palpable error or manifest injustice as required by CR 61.02. There is no basis for relief on such grounds.

The Court of Appeals did not commit reversible error in denying the petition for mandamus. The Court of Appeals properly determined that the Jefferson Family Court project is a temporary "joint research project" of the judiciary and General Assembly and is structured in a constitutionally permissible manner. The panel of the Court of Appeals held that Judge Fitzgerald was constitutionally vested in his capacity as a special circuit judge with appropriate subject matter jurisdiction to consider the divorce proceedings. Accordingly the Court of Appeals was correct in denying the petition for a writ of mandamus.

It is not for us to say that the implementation of the project could have been accomplished in a better fashion. Perhaps the assignment of cases should be on a random

basis; perhaps participation by the litigants should be voluntary; perhaps the establishment of a Family Court should have been as a division of the circuit court with a definite time limitation imposed by the legislature. Our only task is to determine the nature of what has been established and its constitutional status.

Our research indicates that approximately fifteen states have adopted the Family Court concept to some degree. A comprehensive review of the Family Court system in the United States may be found in an article by presiding Judge Robert W. Page of the Family Division of the Superior Court of New Jersey in 44 *Juv. & Family Ct.J.* 1 (1993). One of the most interesting observations made by Judge Page is that "the optimal situation would be the establishment of a Family Court as a division of the highest court of general jurisdiction." *Id.* at 40.

Our review of the establishment of Family Courts indicates that in Virginia, the pilot project was complete in no more than ten years. In New York, the Family Court was established pursuant to a constitutional amendment. *See* N.Y. Const. art. VI, § 13 (Amended 1961). The Supreme Court of Florida created a Family Court by adopting the Task Force Report in an opinion. *In re Report of the Com'n on Family Cts.*, 588 So.2d 586 (Fla.1991).

The Family Court concept indicates no single pattern adopted by all the states that have used the system. Simply calling something Family Court does not always make it such. *Cf.* Robert E. Shepherd, Jr. *Juvenile Justice*, 8 Crim.Just. 37 (1993)

■ It should be clear that the creation of any court is vested only in the legislature by virtue of Sections 112 and 113 of the Constitution, and new district or circuit courts can be established only upon a certification of necessity by the Supreme Court.

The final form, if any, of the Family Court will need to be detailed in legislation. That does not mean that one branch of government cannot assist another branch of government in analyzing the methods to make a system of government including the administration of judicial matters more effective.

The funding of the pilot program by the General Assembly gives approval to the actions taken by the Chief Justice to implement the recommendations of the Task Force set up by the General Assembly itself. The concurrent resolution which created the pilot project requires funding periodically by the legislature. The duration of such funding and the duration of the project is clearly within the bounds of the legislature. Under the rules of comity, the judiciary has not invaded the province of the legislature. The Chief Justice cannot and has not created a court system. The General Assembly could require a termination of the project or, in effect, a report which could be used to determine the permanent status of a Family Court.

The Florida experience reported *In re Report of Commission on Family Courts, supra*, required that each judicial circuit in Florida was to develop a local rule establishing a Family division in its circuit. In formulating its local rule establishing a Family division, each judicial circuit in Florida was to develop its plan in accordance with available local resources and was also to develop an appropriate plan for its jurisdiction as if a Family division were properly funded by the state. The concept of a division of the circuit court is not entirely foreign to Kentucky jurisprudence. There is no valid reason why the General Assembly, with the assistance of the judiciary and a special committee of the judiciary should not be able to formulate a workable program which would combine the authority and jurisdiction of the district and circuit courts and include the feature of one judge/one case so popular in Family Court parlance.

There remains a vexing concern about how long the temporary appointments can be used to implement the Family Court project. It is not appropriate for this Court to advise the legislature as to when such a pilot project should be completed. Such a decision is within their sound legislative judgment. Future litigation as to the length of the project is not necessarily foreclosed by our decision here.

We must conclude that Judge Fitzgerald is presiding over the dissolution action in a

proper and constitutional manner pursuant to his appointment as a special circuit judge in conformity with Section 110(5)(b) of the Constitution. The Family Court project does not create a new and unconstitutional court in violation of Sections 27, 28 or 109 of the Constitution. Consequently, Penny L. Kuprion has not been denied equal protection of the law pursuant to either the United States or Kentucky Constitutions. The Court of Appeals correctly denied mandamus.

The decision of the Court of Appeals to deny the writ of mandamus is affirmed.

LAMBERT, SPAIN, and STUMBO, JJ., and ROBERT S. MILLER, Special Justice, concur.

REYNOLDS, J., concurs in majority opinion in result only.

ROBERT S. MILLER, Special Justice, also files a separate concurring opinion in which SPAIN and STUMBO, JJ., join.

DAVID TACHAU, Special Justice, files a separate dissenting opinion.

STEPHENS, C.J., and LEIBSON, J., did not sit.

ROBERT S. MILLER, Special Justice, concurring.[1]

I agree entirely with the result and the reasoning of this court's principal opinion, but feel constrained by the reasoning of the dissenting opinion respectfully to propose an underlying analysis which I believe independently supports the court's principal opinion. Most of my differences with the dissenting opinion are covered by the principal opinion itself, or are self-evident. The notion, for example, that the Chief Justice has created a new court is to me at best a legal conclusion adopted to characterize reasoning on a different subject, and at worst a play on words. The Chief Justice purported to grant the

authority of a Circuit Judge to a District Judge; and if he did that properly, he did that and no more.

More fundamentally, though, I believe that the dissenting opinion has been misled by the fact that both Penny Kuprion and Robert Kuprion framed the arguments in their briefs by reference to *Legislative Research Com'n v. Brown,* Ky., 664 S.W.2d 907 (1984), a leading modern authority of this court (as the dissenting opinion correctly quotes) on the *"mandate"* of Kentucky's constitution to *"prohibit* incursion of one branch of government into the powers and functions of the others." *Id.* at 912 (emphases in the original). Much of the discussion of the court in *Brown,* which involved a series of attempts by the General Assembly to delegate or expand its own traditional means of operation, turned on whether the duties sought to be assigned or stretched called for this court to apply to the constitution "a strict construction" or "a so-called liberal construction." *Id.* at 914 and 913. The dissenting opinion over and over harks back to this language of *Brown,* which I believe is so far afield from the issues before this court that we would be just as well served to consider *Brown* as a part of a different body of law. *Brown* did not focus directly on any issue between the · legislative branch and the judicial branch, much less on an issue where the two branches have agreed, nor where there are express constitutional provisions that point in opposite directions on the facts before the court. Thus, that opinion gives some, but severely limited guidance to the resolution of the issues in this case. Indeed, in a footnote, this court pointed out that our constitution itself confuses the theoretical question it faced in *Brown,* because "certain normal functions of one branch are specifically granted to another." *Id.* at 912. That is this case.

The historic interface between the executive and judicial branches, on the other hand,

**1.** I am not unmindful (and I know that the author of the dissenting opinion also is not) of the language *Kentucky Utilities v. South East Coal,* Ky., 836 S.W.2d 407 (1992) to the effect that "[a]n issue involving the administrative authority of this Court must be determined by its Justices, rather than executive appointees." *Id.* at 408. As held in that case, the Chief Justice nor Justice

Leibson need have disqualified himself by virtue of having participated in the 1991 Order or the development of the Jefferson Family Court, but having done so, the constitution itself plainly requires "executive appointees" to participate in this decision under a sentence in Section 110 of the Kentucky Constitution which was not involved in *South East Coal.*

is finely textured and complex.[2] Unlike the existence of a bright line between those two branches as is suggested in the very different context of *Brown*, it is the rare case where the distinction in inherent roles is clear. *See*, for example, *Lovelace v. Commonwealth*, 285 Ky. 326, 147 S.W.2d 1029 (1941) (probation v. parole). Much more typical is the long-standing willingness of this court to allow a great deal of legislative involvement in the development of the procedural rules under which the judicial system functions every day. Without specific constitutional provisions, this court, as a matter of "comity," has long allowed legislative rule-making in this area of "inherent" judicial power, so long as the operation of the courts was not "impaired," or made "unworkable" thereby. *Burton v. Mayer*, 274 Ky. 263, 118 S.W.2d 547, 549 (1938). "Cooperation" of these co-equal branches was often encouraged through the years. *Commonwealth v. Furste*, 288 Ky. 631, 157 S.W.2d 59 (1941); *Clark v. Payne*, 288 Ky. 819, 157 S.W.2d 63 (1942); *Craft v. Commonwealth*, Ky., 343 S.W.2d 150 (1961). The same approach continued in the period after the adoption of the present constitution, which expressly directs control of rule-making by this court. *O'Bryan v. Commonwealth*, Ky., 634 S.W.2d

153 (1982); *Combs v. Huff*, Ky., 858 S.W.2d 160 (1993). *See* also *McCoy v. Western Baptist Hospital*, Ky.App., 628 S.W.2d 634 (1981).

On the other hand, this court has recognized areas of apparently per se "impairment" when confronted with legislative attempts to control more purely judicial-branch matters, limiting the use of judicial contempt powers, *Arnett v. Meade*, Ky., 462 S.W.2d 940 (1971), auditing the finances of the Bar, *Ex Parte Auditor of Public Accounts*, Ky., 609 S.W.2d 682 (1980), applying general Open Records rules to court records, *Ex parte Farley*, Ky., 570 S.W.2d 617 (1978), or judging the competence of witnesses, *Gaines v. Commonwealth*, Ky., 728 S.W.2d 525 (1987), *Drumm v. Commonwealth*, Ky., 783 S.W.2d 380 (1990).

More instructive for this litigation, though, has been this court's willingness to share its familiar functions when it chooses and for reasons satisfactory to it, *and* the concomitant respect of that principle on the part of the General Assembly. *See*, for example, *Lunsford v. Commonwealth*, Ky., 436 S.W.2d 512, 514 (1969), in which the legislature enacted apparently binding rules involving

2. The relationship between Congress and the federal judiciary, beginning with a different tradition and different constitutional language, encounters the same problems, resolving them quite differently than Kentucky. It is therefore doubly misleading that the dissenting opinion in several places quotes *Brown's* quotations from an opinion of the United States Supreme Court. In fact, the federal analysis begins with the very broad notion that "Congress may prescribe how federal courts are to conduct themselves with respect to subject matter over which Congress plainly has the power to legislate." *Prima Paint Corporation v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 405, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270, 1278 (1967). For that reason, the federal rules of civil procedure are adopted pursuant to authority granted by statute, and are subject to being overruled by Congress. *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc. and Michael Shipp*, 498 U.S. 533, 552, 111 S.Ct. 922, 933–34, 112 L.Ed.2d 1140, 1159 (1991). Similarly, the U.S. Supreme Court holds that "Congress may confer on the federal courts jurisdiction over any case or controversy that might call for the application of federal law." *Verlinden V.B. v. Central Bank of Nigeria*, 461 U.S. 480, 492, 103 S.Ct. 1962, 1971, 76 L.Ed.2d 81, 91 (1983). The U.S. Supreme Court has been

reluctant to make broad use of delegations of what we would think of as being uniquely judicial functions such as evidentiary privileges, believing those to be "particularly a legislative function." *University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 189, 110 S.Ct. 577, 582, 107 L.Ed.2d 571, 582 (1990). In the area of administrative law, the U.S. Supreme Court began at the same place as *American Beauty Homes*, *infra*, but pulled away from that position as early as *United States ex rel Bernardin v. Duell*, 172 U.S. 576, 582, 19 S.Ct. 286, 287–88, 43 L.Ed. 559, 561 (1899), and has development a body of law which Professor Davis calls "a little queer," and at best difficult to rationalize. Davis, *Administrative Law Treatise* (1958) at page 182. The U.S. Supreme Court's search for the public policy declared inferentially by various U.S. constitutional provisions is as complex as Kentucky's, and quite different. *See*, for example, Horwitz, "The Constitution of Change: Legal Fundamentality without Fundamentalism." 107 H.L.Rev. 32 (1993). With respect to Congress' authority to limit the powers of the courts (particularly the Supreme Court), *see* Calabresi and Rhodes, "The Structural Constitution: Unitary Executive, Plural Judiciary," 105 H.L.Rev. 1153 (1992)

criminal rights and procedure, but added that they "shall not be effective as a statute, but shall be construed as a concurrent resolution directed to the Court of Appeals."

A similar pattern can be seen when the legislature attempts to delegate functions to the judiciary which are not wholly appropriate to this branch of government. This court holds in a general way that "the Legislature is without authority to delegate such a legislative function to the courts." *Boone County v. Town of Verona,* 190 Ky. 430, 227 S.W. 804, 806 (1921). In the extraordinarily powerful case of *American Beauty Homes Corp. v. Louisville and Jefferson County Planning and Zoning Commission,* Ky., 379 S.W.2d 450, 453 (1964), Commissioner Clay expressed the frustration of the judicial branch with the legislature's attempt to require the courts to hold de novo hearings in highly charged, highly political zoning cases, and expressed a strong view, both on legislative interference with and delegation to the judiciary:

> In order that the independence of the three distinct departments of government be preserved, it is a fundamental principle that the legislature cannot invade the province of the judiciary. [citations omitted] It cannot take away judicial power. [citations omitted] Nor may it impose upon the judiciary nonjudicial duties. [citations omitted].

Even in the area of zoning, however, judicial fact-finding has been engaged in since *American Beauty Homes,* and approved by Kentucky courts, as in *Bryan v. Salmon Corp.,* Ky.App., 554 S.W.2d 912, 917 (1977):

> The circuit judge found a compelling need to rezone the property ... The changes found by the court dictated the compelling need ... Here we have a housing shortage, a feasible way to extend urban services, and a demand for housing in the area.

On the other side of the interface between the judicial and legislative branches are those cases where the judiciary on its own moves into areas which are the daily grist of legislation. While acknowledging that we are not here even asked to resolve the continuing debate about the judiciary's *proper* role, this court certainly understated the judicial *practice* when it said in *Commonwealth ex rel. Cowan v. Wilkinson,* Ky., 828 S.W.2d 610 (1992):

> Clearly the establishment of public policy is not within the authority of the courts. *Id.* at 614.

In the early stages of the development of the British/American judicial system, that was precisely what the courts ordinarily did. Justice Cardozo is quoted in *Mash v. Commonwealth,* Ky., 769 S.W.2d 42 (1989), aptly calling judge-made law a part of the "blend" of public policy formulation. *Id.* at 44. That "blend" is the converse of the "comity" which dominates the judiciary's tolerance of legislative incursions into the judicial arena. If it were not for "the common law," law libraries in Kentucky would be shrunken remnants of themselves. The above quoted statement is entirely true, however, when one focuses only on (a) the express grant of legislative power by the constitution, and/or (b) any matter on which the legislature has actually acted. Thus it is entirely correct to say:

> The establishment of public policy is *granted* to the legislature alone. It is beyond the power of a court to vitiate an *act of the legislature* on the grounds that public policy promulgated therein is contrary to what the court considers to be in the public interest. *Commonwealth Ex Rel. Cowan v. Wilkinson,* Ky., 828 S.W.2d at 614. (Emphases added)

Even that clear rule, however, is subject to this court's right to find "jural rights" expressly or impliedly in our constitution, *see Wittmer v. Jones,* Ky., 864 S.W.2d 885 (1993), and to limit the policy-making role of the legislature to prospective legislation, as this court has held it "crystal clear that courts are the proper forums to determine the issues presented in the interpretation of past transactions." *Akers v. Baldwin,* Ky., 736 S.W.2d 294, 309 (1987).

Even here, however, there is a functional equivalent of the doctrine of "comity," in that the legislature's expression of intent is given deference, even if it cannot be given controlling effect. The Court of Appeals most recently applied this principle in *Wigginton v.*

*Com. Ex. Rel Caldwell,* Ky.App., 760 S.W.2d 885 (1988). ("[W]e have no problem with the court's decision to not apply KRS 406.031 retroactively. However, the enactment of that statute does provide guidance in that it clearly evinces a legislative intent to limit liability ...").

In such cases as *Rose v. Council for Better Education, Inc.,* Ky., 790 S.W.2d 186 (1989), this court has gone far to force the legislative branch to adhere to extraordinarily complex and difficult constitutional mandates, but, at the same time, urges "restraint" upon itself when it accepts the responsibility to judge the legislature's own rules. *Philpot v. Patton,* Ky., 837 S.W.2d 491, 494 (1992).

Indeed, when this court moves back and forth across the very difficult boundary line between proper and excessive reliance on the policies of the judiciary, it notes that it may be "somewhat presumptuous" in some of its determinations. *City of Lexington v. Motel Developers, Inc.,* Ky., 465 S.W.2d 253, 256 (1971).

The power of this court to declare acts of the legislature unconstitutional is enhanced when the legislature steps into a judicial arena, even if the constitution gives express power to the legislature so to act. Thus in *Willis v. Jonson,* 275 Ky. 538, 121 S.W.2d 904 (1938), where the legislature acted as mandated by the constitution to create judicial districts, this court took the unusual step to declare that "it is our duty to examine the facts in order to determine whether or not there was any evidence to support the legislative conclusion that a new district was necessary." *Id.* at 907. Such raw fact-finding is to be contrasted with the extreme unwillingness of this court to accept a delegation of the power to make judgments on political districts, even when the legislature chooses to ask the judiciary to make districting judgments. *Fawbush v. Bond,* Ky., 613 S.W.2d 414 (1981).

It is our duty, then, to examine *this* case in the light of the historic relationship between the legislative and judicial branches, noting that we are *here* dealing with a case, FIRST, where the constitution has (a) expressly delegated to the legislature a function in the judicial realm, and (b) expressly granted to the Chief Justice of the Supreme Court a power which he here purports to exercise, and SECOND, where each branch has sought and obtained the cooperation of the other.

If I differ anywhere from the entire reasoning of the principal opinion of this Court, it would be in my belief that the principal opinion takes too seriously the word "temporary." In the most fundamental sense, it is futile to determine in some general way whether Judge FitzGerald is acting in a "temporary" capacity. As this court's principal opinion notes, since Judge FitzGerald serves until "further orders of the court," his tenure could terminate at any time. What could be more fleeting than an appointment at the discretion of the Chief Justice? In that same sense, though, all life is temporary. Who can say that any judge will serve out his or her entire term? As the dissenting opinion says, three and one-half years have passed since Judge FitzGerald's appointment; and the General Assembly has as yet shown no signs of enacting a "permanent" solution to the problems addressed by the General Assembly, by the Task Force and by the family court project. Nor has the General Assembly shown any sign of ending Jefferson County's experiment. Out of context, the word "temporary" could mean almost anything—or nothing.

The case most like this one in constitutional format is *Craig v. O'Rear,* 199 Ky. 553, 251 S.W. 828 (1923), a case, incidentally, cited in *Brown,* in which the legislature [3] purported to appoint "temporary agents" to perform functions in establishing two schools for elementary school teachers, which functions the legislators were not willing to assign to executive "officers exercising a portion of the sovereignty of the state." *Id.* at 831. A part of this court's determination in *Craig* that the legislature could so act lay in the fact

---

**3.** We deal with this case as an activity of the judicial branch of government, while in fact it involved an act of the Chief Justice. Similarly, in the *Craig* case, the leadership of the general assembly actually exercised the powers of appointment. As in *Brown,* for purposes of these matters, it is appropriate so to treat these legal issues.

that the need addressed by the legislature would end of its own accord, once the schools were up and running (not to mention once they were funded by subsequent General Assemblies), and the "temporary" agents had been assigned only "functions [which] cease when the purpose is accomplished." *Id.* at 831. So, too, with the experiment in Jefferson County which is here examined.

A large part of the reasoning of the decision in *Craig,* however, involved the fact that the temporary actors were mere "agents" and not full-fledged "officers" of the sovereign. Thus, this court approved an assignment of relatively low *status,* which it might not have done had the assignment otherwise been a duty of a permanent officer. The matter of status, however, is expressly addressed by our constitution in this case. The Chief Justice is plainly allowed to grant Circuit Judge status to District Judges. Thus, we are left with the teaching of *Craig* that "temporary" appointments are involved where the appointees' "functions cease when the purpose is accomplished." The "temporary" nature of Judge FitzGerald appointment, by parity of reasoning, is measured, not by whether he can be expected to live forever or for the large portion of a Circuit Judge's eight-year term, and certainly not (as the dissenting opinion would require) by whether he serves for a pre-determined number of days. Rather, his term is temporary (under section 110 of the constitution) if he will no longer serve when his service is no longer "necessary for the prompt disposition of causes." While a different result might be required if some disguised intention of permanence could be implied by a 20–year tenure for the 1991 order, or even hinted by the ten years described by the court's principal opinion,[4] whether or not the present appointment is "temporary" will be answered at the same time we determine whether Judge Fitz-Gerald's appointment was made "for the prompt disposition of causes." This is not a separate question at all. If the constitution and sections of the constitution are to be read "as a whole," *Wood v. Board of Education of Danville,* Ky., 412 S.W.2d 877, 879 (1967), it is certainly appropriate to read this one constitutional sentence as a whole. It is therefore more important that the 1991 Order was entered "[i]n order to implement the Family Court Project in Jefferson County," than that the appointments are "subject to further orders of this Court."

The question, then, narrows itself: Shall this court give effect to the act of the Chief Justice as a means to address "the prompt disposition of causes," an exercise of one express power in "cooperation" with the legislature's present unwillingness to exercise its ultimate authority to alter the assignment of jurisdiction among the courts?

The search for "promptness" may be visible at two levels, both in (a) the judicial economy sought by the experiment itself, and (b) the speed with which the legislature can arrive at its ultimate conclusion by the use of a one-county experiment, as opposed to adopting immediately a generally applicable statute or constitutional proposal in uncharted waters.

Were we making a judgment of the "necessity" of this method of attaining the constitutional purpose on our own, I would propose that we weigh several factors, (a) the relative "predominance" of the need for "promptness" in the establishment of the experimental program, (b) the "close relationship" between promptness and the other reasons supporting family dispute reform and the one-county test, and (c) the availability of other methods for accomplishing the goal of promptness. This three-part test is suggested by Commissioner Clay in *Chrisman v. Cumberland Coach Lines,* Ky., 249 S.W.2d 782, 784 (1952), in the context of the court's determination of whether a mixed-purpose endeavor (a public transportation system owned by a private entity) constitutes a "public purpose." Even in such a context, this court has never found it "troublesome" that additional goals are also met by an act done for a proper purpose. So far as I can determine, no decision set aside an authorized good deed simply because some other good deeds were performed simultaneously.

On the other hand, we are not here making a de novo determination, but judging an ac-

---

4. The motive of the Chief Justice is to be tested, I believe, under standards to be discussed below.

tion of the Chief Justice. Were we dealing here with the deed of another constitutional actor, it would be entitled to the presumption of having acted for the proper purpose, as in the case of a city legislative body exercising inherent power, *City of Paducah v. Moore*, Ky., App., 662 S.W.2d 491, 495 (1984) ("The City's motive in doing what they did is not before the court on this appeal except with respect to the ultimate result of the motive, the creation of a subterfuge in order to accomplish what they wanted to do."), or the state legislature itself acting under constitutional constraints, *Holsclaw v. Stephens*, Ky., 507 S.W.2d 462, 472 (1974) ("Nothing in the record before us suggests an attempt by the General Assembly to escape or avoid constitutional limitations applicable to city and county governments by the expedient of calling them by another name. If such were the case the act would amount to no more than a subterfuge and we would not hesitate to strike it down.")

The dissenting opinion does not dispute this presumption, but argues that the opposite presumption exists when there is a potential conflict between branches of government. If the history of "comity" and "blend" teaches us anything, however, it is that there is no such radical reversal of presumptions, particularly where each branch is exercising an express constitutional power, and each seeks the "cooperation" of the other.

The dissenting opinion's proposed alternative would require a "clearly-stated and well-founded" finding by the Chief Justice. This standard is violated, says the dissenting opinion, because the Chief Justice "did not explain" his action fully in his order, and because there is insufficient "support in the record" upon which to judge the Chief Justice's unmade finding. The dissenting opinion thus proposes [5] some sort of due process standard, like those developed by this court and others to be applicable only to individual adjudications. The case of *Caller v. Ison*,

Ky., 508 S.W.2d 776, 777 (1974) ("such finding does not contain sufficient adjudicative facts to permit a court to conduct a meaningful review"), is, after all, among the progeny of *City of Louisville v. McDonald*, Ky., 470 S.W.2d 173, 178–179 (1971): ("On the other hand, when the local legislative body is used as a vehicle *not to make generally applicable law*, rules or policy, but to decide whether a particular individual as a result of a *factual situation peculiar to his situation* is or is not entitled to some form of relief, then the so-called legislative body must act ... upon the basis of appropriate findings of either the commission or the legislative body, which are supported by substantial evidence ...."). Absent the fundamental fact pattern requiring procedural due process (that is, the phrase underlined in this quotation from *McDonald*) this court has always held, as in *Hohnke v. Commonwealth*, Ky., 451 S.W.2d 162, 166 (1970):

> Where a rule or regulation of a public administrative agency is within the scope of the authority of such agency it is considered prima facie, or presumptively, valid and reasonable, and the one who raises the question has the burden of pleading and proving facts showing the invalidity of such rule or regulation.

No authority is cited to establish that such a standard as proposed by the dissenting opinion has ever been applied to any constitutional actor exercising legislative and/or rule-making powers. Must the Chief Justice, like a zoning board determining the use of an individual's property, also hold a hearing and make a record? Certainly not.

I believe it is not material that Kentucky's constitution expressly requires that the General Assembly identify the subject matter of statutes in their caption. No case or reasoning is cited to suggest that this express provision impliedly requires even the legislature to make any findings at all, much less "clearly-stated and well-founded" ones. Nor, of

---

5. The dissenting opinion hints that the principal opinion agrees in this respect. I believe that the dissenting opinion fails to distinguish between the principal opinion's statement that the Chief Justice's act "must be rooted in fact," as opposed to that opinion's statement that the basis of the order "should be noted" on its face. The latter language does not support the statement contained a few sentences later in the dissenting opinion, which says that the principal opinion "required" that there would be some "basis in the record" to support the Chief Justice's finding. The actual requirement has been satisfied.

course, does that part of the constitution apply to the judiciary. Further, I find no basis in logic or authority to suggest that "routine budgetary and administrative actions" under one sub-section of Section 110 call for so vastly a different standard of determination than actions under a sentence which appears an inch away on the same page and section of our constitution.

The error of dissenting opinion's proposed requirement of a "clearly-stated and well-founded" finding is, I believe, reflected in at least two further matters. First of all, the dissenting opinion would hold that this court cannot go beyond the record in this particular case, viewing only papers filed in a single lawsuit litigated by two parties without substantial financial resources, when it determines whether or not the Chief Justice of the Kentucky Supreme Court has violated the constitution. It would, however, be equally appropriate (and equally unhelpful) to note that the burden ordinarily rests upon appellants to show in the record sufficient facts to support the relief they claim. *See, e.g., Reichle v. Reichle,* Ky., 719 S.W.2d 442 (1986). In fact, *so far as this record is concerned,* there is not the slightest hint that Chief Justice Stephens did not determine in good faith, nor indeed that he did not determine correctly, that there is a necessity for Judge Fitzgerald's appointment to accomplish the "prompt determination of causes." On what basis can the dissenting opinion say that "the facts starkly establish" what has happened in Jefferson County? Applying the standard suggested by this part of the dissenting opinion, all that can be said is that we have no way of knowing one way or the other. So far as we can tell, the Chief Justice could well have determined that the most expeditious way to develop a proper and permanent solution to the problems associated with family-type cases, which perma-

nent solution might have the effect of speeding domestic matters through the judicial system, was the present Jefferson County Family Court experiment. The dissenting opinion concedes as much ("My point is not that family courts do not promote the 'prompt disposition of causes'. Perhaps they do.").

It is also, I think, inaccurate to state that "[t]he majority evidently concludes" that anything has happened, much less has it "concluded" that the Chief Justice's determination was "well-founded." The principal opinion of this court concludes only what it says it concludes: We do not see where the Chief Justice has exceeded his discretion.

We need not, however, decide this case by reference only to the papers Penny Kuprion and Robert Kuprion chose to file in the trial court, nor by reference only to full-fledged findings of fact included in the order itself. An appropriately stringent test for considering evidence of the Chief Justice's intent has been applied to legislative action in determining whether it meets a very narrow constitutional exception. It is found in *Tabler v. Wallace,* Ky. 704 S.W.2d 179 (1986). That case permits consideration of matters "from legislative history, from the statute's title, preamble or subject matter, or from other authoritative source." *Id.* at 186. In this case, those matters certainly would include the legislature's concurrent resolution, its three applicable budgets and the Task Force report. All are integral parts of the "legislative" history of the 1991 order.[6] The "subject matter" of this debate (the prompt disposition of family disputes) is well known to most members of this court; and a view of the vastly increased speed of resolving critical family issues was eloquently described by Robert Kuprion's counsel at the oral argu-

---

6. The Task Force report amplified the "Whereas" portions of the Concurrent Resolution. It listed ten findings, including the notion that fractionalization of family-type jurisdiction leads to a waste of time and to delays, in that (a) it "increases the time and expense involved in these cases," and (b) it creates "an inordinate delay between intake of a case and the final resolution." Unhelpfully, the dissenting opinion rejects the correct summary contained in the principal opinion of this court, simply because it is

merely a summary. The Task Force also recommended action by this court, *and* by the General Assembly itself. Two of its four recommendations were as follows: "(1) That the Kentucky Supreme Court establish, by Rule, a Pilot Family Court Project for the 1990–92 biennium, with at least one urban and one rural location. (2) That the 1990 Kentucky General Assembly fund such a Pilot Project, including implementation and evaluation." *Both* branches of government did much of what the Task Force recommended.

ment of this case. Penny Kuprion's counsel honorably conceded that Robert Kuprion's counsel had given a reasonable description of the effects of the Family Court Project in Jefferson County, a view which he did not necessarily share. Further, he agreed that some time (certainly I believe to be measured in years) is required to work out the details of such a program.

The second level at which the dissenting opinion's "clearly-stated and well-founded" standard asks too much is when it insists that this court depart from the approach it would take to legislative action in relation to judicial powers, rejecting any reference to the ongoing views of the branch of government whose powers are supposedly infringed upon. The legislature's initial request for further study, and its request for participation by the judiciary (both included in the concurrent resolution) [7], as well as the legislature's recurrent funding of the Family Court Project are, of course, not entirely dispositive. Because of the cases which exclude one branch from participation in some of the functions of the other, irrespective of the desire of both to cooperate, the body of law involving the judicial-legislative interface teaches us to ask whether the Jefferson County Family Court is so pure and sacrosanct a legislative concern that the judiciary must withdraw from it at all costs, so as to reverse the presumption that the Chief Justice acted in good faith in accordance with the constitution's standard. As is perfectly obvious when so phrased, this is not such a matter. This is (in the words of *Brown* ) a case where a "normal function of one branch [has been] specifically granted to another," and so we must give some deference to legislative judgment, and consider that judicial participation was first invited and later approved by the legislature, by its Concurrent Resolution and by successive budgets.

It is long and well established that the legislative branch of government can express and effect its views on public policy through resolutions which do not require the signature of the governor. Thus *see Foley Construction Company v. Ward,* Ky., 375 S.W.2d 392, 394 (1964) ("Originally, the right to sue the state was obtained by a joint resolution enacted by the Legislature"); *Commonwealth v. McCoun,* Ky., 313 S.W.2d 585, 588 (1958) ("Although all joint resolutions are not necessarily regarded or treated as laws, yet a resolution of this present character is regarded as having the force and effect of a law"); *Rhoads v. Miller,* 298 Ky. 346, 182 S.W.2d 248, 249 (1944) ("A Joint Resolution providing an allowance for postage, telephone, stationery, supplies and stenographic work, to each member of the present General Assembly, and the Lieutenant–Governor.")

Similarly, the cases which debate the relationship between budget decisions and statutes, *Com. ex rel. Armstrong v. Collins,* Ky., 709 S.W.2d 437 (1986), *Smith v. Kentucky State Racing Commission,* Ky.App., 697 S.W.2d 153 (1985), reflect the fact that budgeting is (as this court's principal opinion aptly says) in many ways the most dramatic means the legislature has to express itself.[8]

It is therefore appropriate that our determination that the Chief Justice's 1991 Order was a good faith attempt to exercise his powers under Section 110 of the constitution be framed to reflect the prior judgment by the legislature on that subject. We are required to give deference to that judgment.

I believe, therefore, that the concurrent resolution of the Legislature, the report of the Task Force, several bi-annual budgets, and what the members of this court have observed to be a sensible approach to a serious problem, all mandate our conclusion that the Chief Justice acted reasonably and in good faith within the parameters of the

---

7. It is quite true, as the dissenting opinion says, that the concurrent resolution did not expand upon the purposes for this project, much less the "promptness" aspect of the matter. That came later, after the Task Force had reported its multipurpose goals, and after the first year (and again after the second and third years) of the project were undertaken.

8. The dissenting opinion's quotation from *Ex parte Auditor,* 609 S.W.2d at 682, correctly places the word "only" in brackets. That is a word supplied by the dissenting opinion, and not this court. In any event, *Ex parte Auditor* is there discussing the inability of the legislature to control judicial administration, and is in no way limiting the impact of budgetary decisions on subjects appropriate for legislature action.

constitutional authority expressly granted to him.

SPAIN and STUMBO, JJ., join in this concurring opinion.

DAVID TACHAU, Special Justice, dissenting.

While I greatly admire the Chief Justice's progressive efforts to improve the adjudication of the "Family Court" cases, I must respectfully dissent.

## I. INTRODUCTION

As this Court stated in the landmark decision *Legislative Research Commission ex rel. Prather v. Brown*, Ky., 664 S.W.2d 907, 914 (1984), *quoting Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983): "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." The wisdom of these words is particularly evident in circumstances such as these, when the Court is weighing actions taken by the judiciary. Given that there is no other limitation on the judiciary's power within the checks and balances of our system of government, the Court must be especially careful to restrain its own exercise of power.

Our state Constitution specifically gives the General Assembly the *exclusive* power to determine the subject matter jurisdiction of the state's district and circuit courts. Ky. Const. §§ 112(3) and 113(3). The *only* exception to this exclusive power is contained in § 110(5)(b) of the Constitution, which provides that the Chief Justice "shall assign *temporarily* any justice or judge of the Commonwealth, active or retired, to sit in any court other than the Supreme Court *when he deems such assignment necessary for the prompt disposition of causes . . . .*"

Our state Constitution also "contains explicit provisions which, on the one hand, *mandate* separation among the three branches of government, and on the other hand, specifically *prohibit* incursion of one branch of government into the powers and functions of the others." *LRC v. Brown, supra,* 664

S.W.2d at 912, *citing* Ky. Const. §§ 27 and 28. This Court has recently been extremely vigilant in upholding those provisions. *See id.:* "[I]t has been our view, in interpreting Sections 27 and 28, that the separation of powers doctrine is fundamental to Kentucky's tripartite system of government and must be 'strictly construed.'" (Citation omitted.); *Kentucky Ass'n of Realtors, Inc. v. Musselman,* Ky., 817 S.W.2d 213, 216 (1991); *Diemer v. Commonwealth,* Ky., 786 S.W.2d 861 (1990).

Here, the Chief Justice in March 1991 assigned judges to a new "Family Court," and without any legislative authorization, gave the judges elements of the subject matter jurisdiction of both district and state courts. The Chief Justice did not set any limit on the length of time these special judges would serve. Some of them have now served more than three and one-half years with no end in sight.

The Chief Justice also did not explain why he made these appointments, much less whether he deemed these assignments "necessary for the prompt disposition of causes." On the contrary, when the 1988 General Assembly authorized the "Family Court Feasibility Task Force" in House Concurrent Resolution 30, the legislature indicated it hoped the Family Court might achieve two objectives *entirely unrelated to prompt decision making:* "continuity of judicial decision-making" in situations involving multiple family issues, and "development of expertise in the management and disposal of family law cases by the Kentucky judiciary." 1988 Ky.Acts Ch. 128, HCR 30.

The majority's opinion concludes that the Chief Justice's appointments are simply to be reviewed under an "abuse of discretion" standard, op., *supra,* at 684, and under that deferential standard, the appointments are "constitutionally permissible" as part of a "a temporary 'joint research project' of the judiciary and General Assembly." *Id.,* at 685. I cannot agree with either conclusion.

First, while it may be appropriate to adopt the "abuse of discretion" standard toward routine administrative actions the Chief Jus-

tice takes as "executive head of the Court of Justice," Ky. Const. § 110(5)(b), that deferential standard of review is completely inconsistent with the Court's separation of powers jurisprudence. Applying the "abuse of discretion" standard in this case squarely contradicts the "fundamental" doctrine that conduct by one constitutional actor involving the possible "incursion of one branch of government into the powers and functions of the others" must be "strictly construed." *LRC v. Brown, supra,* 664 S.W.2d at 912.

Second, even applying the "abuse of discretion" standard, there is no support in the record for the Chief Justice's actions, and the majority's ruling makes the restrictive language of § 110(5)(b) meaningless. Indeed, the majority's decision is made even more unnerving by its suggestion that the Family Court is "constitutionally permissible" because it is simply a "joint research project." So far as I know, there is no precedent for the contention that the Constitution can be suspended for a "research project," no matter how praiseworthy its aims.

## II. THE CREATION OF THE FAMILY COURT

I completely agree with the starting point of the majority's analysis, *see* Maj. op., *supra,* at 683:

Section 110(5)(b) of the Constitution does not confer unbridled, absolute or unlimited power on the Chief Justice in his capacity as Chief Executive of the court system. The Section refers only to temporary appointments of judges to provide for the prompt disposition of cause[s]. It should be pointed out that the word "temporary" relates only to the appointment of the judge. In no way can a temporary court be created by an order of the Chief Justice. Such an extraordinary action must be rooted in fact and the reason for the temporary appointment should be noted in the order of appointment.

However, I cannot agree with the majority's apparent understanding of the record.

To begin with, the facts starkly establish that what has happened in Jefferson County is *precisely* the creation of a "temporary court" rather than "the appointment of the judge." As the appellant points out, the Family Court in Jefferson County is known by that name, and its divisions are separately numbered as seven Family Court divisions rather than being known as numbered divisions of Jefferson Circuit Court or Jefferson District Court. Many of the judges appointed to the court have also changed, with new judges rotating on and off the court at frequent intervals, while the continued existence of the court remains constant.

In fact, the Family Court in Jefferson County has its own clerk, its own assignment numbers, and even its own seal. The Family Court even operates under special rules of court approved by this Court on July 28, 1993 that are distinct from other civil or criminal rules. In sum, I agree with the majority that "In no way can a temporary court be created by an order of the Chief Justice"—but that has clearly happened here, regardless of the majority's efforts to call it a mere "division" or "pilot project."

Likewise, contrary to the apparent views of the concurring opinion, I also agree with the majority that "Such an extraordinary action ["temporary appointments of judges to provide for the prompt disposition of cause[s]"] must be rooted in fact and the reason for the temporary appointment should be noted in the order of appointment." But this never happened. As noted above, so far as we know, the Chief Justice has never explained in any official act or opinion, including in his March 20, 1991 Order, why he made the Family Court appointments.

Moreover, even if the appointments *were* made to promote the "prompt disposition of causes," there is no basis in the record for concluding that this was "rooted in fact," as the majority says is required. Disregarding the personal opinions of counsel at oral argument, there is simply no evidence that the Chief Justice's "temporary" appointments "in fact" serve to promote the constitutionally sanctioned objective of "the prompt disposition of causes."

The majority evidently concludes that the Chief Justice's appointments were well-founded as efforts to promote "the prompt disposition of causes" because of events that

supposedly preceded the appointments. In particular, the majority explains that the 1988 General Assembly authorized the appointment of a task force to examine the need for and the feasibility of establishing a Family Court, and subsequently:

> The Task Force report in 1989 amplified the preamble to the concurrent resolution which established it by making ten findings, including the idea that fractionalization of family jurisdiction leads to a waste of time and delays, that it increases the time and expense involved in these cases and creates an inordinate delay between intake and final resolution.

Maj. op., *supra*, at 681.

This explanation is troubling for several reasons.

First, regardless of what the 1989 Task Force concluded, it is important to recognize that when the 1988 General Assembly authorized the Task Force, the legislature never mentioned delays in the adjudication of family disputes among the problems it sought to address, nor prompt decision making among the benefits that might result from a family court. *See* 1988 Ky.Acts Ch. 128, HCR 30. Instead, the legislature was focused on the "overlap[ping] ... matters of dispute or crisis within particular families," including "matters concerning dissolution of marriage, spousal maintenance, child support, adoption, terminations of parental rights, establishment of paternity, domestic violence, and juvenile offenses."

Thus, in its *only* statement of purpose for creating the Task Force, the General Assembly noted that "the establishment of a court or division of court particularly devoted to and specializing in family law might promote such *continuity of judicial decision-making* as well as foster *development of expertise* in the management and disposal of family law cases by the Kentucky judiciary." *Id.* (emphasis added). In other words, the legislature has never explicitly or implicitly endorsed the only constitutionally permitted purpose for the Chief Justice's actions. And certainly the 1988 General Assembly did not authorize the actual creation of any family courts, despite the majority's misunderstanding to the contrary. *See* Maj. op., at 686

(emphasis added): "The concurrent resolution *which created the pilot project* requires funding periodically by the legislature."

Second, again regardless of what the 1989 Task Force concluded, it is also important to recognize that neither the 1988 legislature, nor any other General Assembly, has ever amended the statutes establishing the jurisdiction of district and circuit courts, KRS 23A.010; 24A.010; 24A.110–130; 406.021; 403.140. This is not an insignificant problem. *See, e.g.,* KRS 24A.020: "When jurisdiction over any matter is granted to District Court by statute, such jurisdiction shall be deemed to be exclusive unless the statute specifically states that the jurisdiction shall be concurrent."

In 1994, a bill did pass the state Senate which would have allowed judicial districts, upon approval of the Chief Justice, to create family courts with concurrent jurisdictions from district and circuit courts. 1994 RS SB 84. But this bill died in the state House of Representatives. The majority says this is "of no consequence in our consideration," Maj. op., *supra*, at 683, although I am not so sure. At the least, it confirms that the legislature has never exercised its exclusive constitutional power to modify the subject matter jurisdiction of the state's district and circuit courts, Ky. Const. §§ 112(3) and 113(3).

On the other hand, the majority seems to suggest that because the General Assembly has approved the judicial budget in recent years without objecting to special appropriations to the Family Court, the legislature should be considered to have agreed to the modification in district and circuit court jurisdictions. *See* Maj. op., *supra*, at 683. However, it is well-established that the "judicial budget ... [only] provides a means by which the legislative body may assess how much it must appropriate from the treasury," and the General Assembly has no substantive role in "determining the necessity for and the propriety of expenditures" from the judicial budget. *Ex parte Auditor of Public Accounts*, Ky., 609 S.W.2d 682, 685 (1980). Moreover, this oblique sort of implied legislative action would seem barred by § 51 of the state

Constitution, which requires that "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title...." *See Sweasy v. King's Daughters Memorial Hospital*, Ky., 771 S.W.2d 812, 815–16 (1989).

Third, turning now to the "findings" purportedly made in the 1989 Task Force report, it is simply erroneous to state that the report found "that fractionalization of family jurisdiction leads to a waste of time and delays." Instead, those words are blended from two separate portions of the report. On page 2, the report restated the General Assembly's "reasons for establishing the Task Force," and included that overlapping jurisdictions "thereby caus[e] fractionalization and disruption in judicial decision-making continuity." Later, on page 4, the report concluded that "use of *domestic relations commissioners* ... increases the time and expense involved in these cases" (emphasis added). Otherwise, the report found that "there exists in many courts an inordinate delay between intake of a case and final resolution," but again the report did *not* find that creation of family courts would assist this problem.

Indeed, the report pointed to several benefits of creating family courts which—like the General Assembly's statement of purposes—had nothing to do with "prompt disposition of causes." These included promoting expertise by judiciary in addressing family disputes ("Family Court judges should be trained in matters of mental health and behavioral sciences as they relate to families"); reducing overlapping jurisdictions by district and circuit courts ("With family matters tried in both district and circuit courts, there is duplication of effort and lack of coordination" and "It would be extremely helpful if the same judge heard all matters relating to the same family, from divorce to child support to juvenile matters"); and addressing other sociological problems ("Citizens perceive decisions of district courts to be of less importance than those of circuit courts. This perception of 'lesser status' mitigates against the establishment of a family court at the district court level.").

My point is not that family courts do not promote the "prompt disposition of causes." Perhaps they do. Instead, my point is that no one told the Chief Justice that family courts would do this, including the 1989 task force. The task force report gave other reasons for establishing family courts, but none of them provides constitutional authority for what the Chief Justice did.

To summarize, although I agree with the majority's initial framework for analyzing the constitutionality of the Chief Justice's appointments, I cannot agree with the majority's application of this framework to the record of this case. Instead, I believe the majority's decision rests on a series of unfounded or inaccurate assumptions about the evidence, and when these assumptions are corrected, the majority has no basis for upholding the Chief Justice's appointments.

## III. SEPARATION OF POWERS ISSUES

Putting aside the flawed assumptions underlying the majority's decision, I also believe the Chief Justice's actions cannot be upheld within the structure of this Court's jurisprudence on separation of powers. This structure is based on Ky. Const. §§ 27 and 28, which provide:

27. The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.
28. No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Because of these provisions, we must evaluate the permissibility of the Family Court appointments not simply in terms of whether a constitutional actor has exercised his powers properly, or has "abused his discretion," as the majority contends. Instead, because these actions potentially invaded the powers assigned by the Kentucky Constitution exclu-

sively to the General Assembly, we should "strictly construe" the Chief Justice's authority and uphold his conduct only if it survives this heightened scrutiny.

The majority's error is perfectly illustrated by comparing this case to *Diemer v. Commonwealth*, Ky., 786 S.W.2d 861 (1990). There, the Court was faced with a challenge to two provisions of the 1976 Kentucky Billboard Act. One provision prohibited signs that were "legible and/or identifiable" from a federal highway. The Court interpreted this provision to be "sufficiently definite to withstand constitutional scrutiny" after noting that "[i]t is our responsibility to read the statutes of the General Assembly so as to save their constitutionality whenever such can be done consistent with reason and common sense, although we cannot go so far as to add additional words to give constitutionally permissible meaning where none would otherwise exist." *Diemer v. Commonwealth, supra*, 786 S.W.2d at 863–64.

This is comparable to the deferential approach the majority now takes to the Chief Justice's actions, *see supra*, at 684 ("We must pause to consider the status of the actions of the Chief Justice. We find them to be acts of discretion that are not an abuse of that discretion."). This approach may be appropriate for routine budgetary and administrative actions taken by the Chief Justice as "executive head of the Court of Justice," Ky. Const. § 110(5)(b). However, this approach is erroneous where the Chief Justice's actions threaten to invade the proper exercise of powers by separate branches of government, as *Diemer* further illustrates.

After accepting the first provision of the Billboard Act, the *Diemer* court invalidated the second provision of the Act prohibiting certain signs "outside of an urban area." The Court characterized this to be "a term of infinite variety depending upon the viewpoint of the person applying it," *id.*, at 864, and held that the legislature had improperly delegated the task of defining the term by administrative regulation to the Secretary of Transportation. The Court explained:

> The requirements of the Kentucky constitutional principle of separation of powers, Kentucky Constitution Sections 27 and 28, are the same. The duty to define general terms cannot be delegated by the legislative branch to the executive branch. Kentucky is a strict adherent to the separation of powers doctrine. As we stated in *Sibert v. Garrett*, 197 Ky. 17, 246 S.W. 455, 457 (1922):
>
> > "Perhaps no state forming a part of the national government of the United States has a constitution whose language more emphatically separates and perpetuates what might be termed the American tripod form of government than does ... [the Kentucky] Constitution...."

*Diemer*, 786 S.W.2d at 864–65.

*Diemer* thus illustrates that although a constitutional actor's conduct might ordinarily be accorded deference because of concerns for comity between branches of government, that presumption of legitimacy evaporates in disputes involving separation of powers issues. In such cases, a constitutional actor's conduct instead is subject to heightened scrutiny and a "strict construction of those time-tested provisions" of §§ 27 and 28 of Kentucky's Constitution. *LRC v. Brown, supra*, 664 S.W.2d at 914; *Kentucky Ass'n of Realtors, Inc. v. Musselman*, Ky., 817 S.W.2d 213, 216 (1991).

Of course, I assume that just as the Court has imposed heightened scrutiny on legislative actions that raise separation of powers concerns, so also the Court would impose heightened scrutiny on actions by executive and judicial officers raising separation of powers concerns. Ky. Const. §§ 27 and 28 contain no suggestion that the different branches of government should be treated any differently in separation of powers disputes.

Indeed, the judiciary should be particularly vigilant to restrain its own exercise of power, because of its unique position as the final and unchecked arbiter of constitutional disputes. Otherwise, of course, if the judiciary fails to restrain itself, other constitutional actors will eventually be unwilling to submit to a different standard and allow courts to judge their conduct.

In the present case, the Chief Justice's Family Court assignments explicitly altered

the subject matter jurisdiction of certain Jefferson County district and circuit courts, despite the General Assembly's otherwise exclusive constitutional authority to determine the subject matter jurisdiction of all district and circuit courts in the state. Ky. Const. §§ 112(3) and 113(3). In my view, and seemingly in the majority's view as well, the Chief Justice was only allowed to make these assignments with the clearly-stated and well-founded intention of promoting the "prompt disposition of causes." (See Maj. op., *supra*, at 683: "Such an extraordinary action must be rooted in fact and the reason for the temporary appointment should be noted in the order of appointment.") But neither of these conditions was met.

In addition, the Chief Justice was also required to make these assignments for a finite term, or to address a finite amount of litigation, in order for them to be considered "temporary." For all practical purposes, however, the very opposite occurred here, where the Chief Justice's March 20, 1991 Order stated that his appointments "shall remain in effect until further order of this Court."

But the most troublesome part of the majority's entire analysis is that it attempts to resolve the thorny separation of powers problems by declaring that the Chief Justice's actions are simply part of an acceptable "joint research project" with the legislature. See Maj. op., at 685: "The Court of Appeals properly determined that the Jefferson Family Court project is a temporary 'joint research project' of the judiciary and General Assembly and is structured in a constitutionally permissible manner."

The casual tone of this statement should not be misleading. What the majority is sanctioning is a completely unprecedented and truly alarming suspension of the Constitution in the guise of a temporary "research project."

The appellant's criticism of this point seems to me well-founded. "[W]here in the constitution is there any power to experiment with the basic foundations of the three branches of government? Can we experiment by eliminating the state senate? How about eliminating the office of Governor?

... If you follow the reasoning of the Court of Appeals, it[']s allowable as long as it is not permanent." Brief of Appellant, at 18.

As the appellant demonstrates, there are vast problems with the idea that we can suspend the Constitution's clear separation of powers for the purposes of a "research project." In *LRC v. Brown, supra,* this Court firmly rejected the suggestion that constitutional powers can be reassigned, or delegated from one branch to another, simply because that might improve governmental functions. Yet that is exactly what the majority appears to embrace here. See Maj. op., at 686: "The final form, if any, of the Family Court will need to be detailed in legislation. That does not mean that one branch of government cannot assist another branch of government in analyzing the methods to make a system of government including the administration of judicial matters more effective."

In conclusion, I would reverse the decision below and issue the writ requested by the appellant. Out of concern for the orderly administration of cases that have been filed since 1991, I would apply this holding prospectively. See *Fischer v. State Board of Elections,* Ky., 879 S.W.2d 475, 480–81 (1994); *Rose v. Council for Better Education, Inc.,* Ky., 790 S.W.2d 186, 216 (1989); see also *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 88, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982) (declaring Bankruptcy Court unconstitutional but applying holding prospectively and staying judgment until Congress would have "an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication without impairing the interim administration of the bankruptcy laws"). In Justice Frankfurter's phrase, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Bank,* 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (dissenting opinion).